Scofield, J.,
delivered the opinion of the court.
A brief history of the Merchants’ Bant of Washington, derived in part from public documents and proceedings of Congress, without influencing the decision of the court, may conduce to the more ready comprehension of the findings upon which the decision is based. This bank was organized in September, 1864; June 5, 1865, it was designated as a “ depository of public moneyMay 4,1866, it failed. On the day of its failure it was indebted for public money more than three-quarters of a million. This money had been deposited by the following officers :
James Harlan, Secretary of the Interior.$18,531 03
D. N. Cooley, Commissioner of Indian Affairs ... 14,505 99
Elijah Sells, Indian agent.'. 5, 513 95
Thomas H. Gardner, Army paymaster. 5,376 82
J. L. Hodge, Army paymaster. 85,000 00
Joseph Pool, Army paymaster. 2,807 88
J. B. M. Potter, Army paymaster... 11,857 47
E. E. Paulding, Army paymaster. 505,851 76
W. B. Rochester, Army paymaster.. 380 36
J. S. Stewart, Army paymaster... 81
D. Taylor, Army paymaster... 5, 000 00
H. L. Robinson, quartermaster. 51,258 93
H. A. Risley, special agent, Treasury Department. 24,542 36
E. B. Olmstead, disbursing clerk, Post-Office Department. 2,215 77
Thomas J. Hobbs, disbursing clerk, Treasury Department ... 25,200 00
Against this large deposit the bank had given security to the Secretary of the Treasury for only $100,000.
The rapid growth of the bank, its disastrous failure, the alleged dishonesty in its management, and the apparent credulity of its victims very largely attracted public attention and criticism.
The House of Representatives directed the Committee on Banking and Currency to make an investigation. The committee reported that the failure of the bank was “to be attributed wholly to the dishonest and criminal conduct of the reck *195 less and unscrupulous men who controlled it.” Among these reckless and unscrupulous men were the bondsmen of Paymaster Paulding. Through this business relation he had been inveigled into making a half million deposit. Though misled and imposed upon by his bondsmen, the committee do not acquit him of illegal and censurable conduct. The report also suggests that the deposit of Quartermaster Eobinson might not have been altogether blameless. Of the other thirteen depositors, of whom the claimant was one, the committee says: “It does not appear that the deposits were made for an unlawful purpose, or that they received any benefit, directly or indirectly, from them.” Congress-immediately passed an act repealing so much of existing law as authorized disbursing officers to deposit public money in “designated public depositories,” and requiring them, except in certain cases, to deposit with the Treasurer or Assistant Treasurer of the United States. The testimony taken by the committee was referred to the Secretary of War. Thereupon Paymaster Paulding was tried by a court-martial for disobedience to orders in making the deposits, convicted, and sentenced to be cashiered, to forfeit all pay due,'to pay a fine of $5,000, and be imprisoned for one year. Owing to the suspicion thrown upon Quartermaster Eobinson, suit was brought upon his official bond by the Treasury Department to recover the amount lost by his deposit. The deposit was made only the day before the bank failed. He was charged with gross negligence. Without leaving the box the jury found for the defendant. The Comptroller of the Currency took possession of the bank and appointed a receiver to wind up'its affairs. Some dividends, amounting in all to about 24 per cent., were made and duly credited to the account of the depositing officers.
The accounts of the two disbursing clerks and the special agent come for settlement before the First Comptroller, but the accounts of the other twelve depositors are settled in the office of the Second Comptroller. The accounts of these latter officers, as they came up from time to time, were settled under the direction of Dr. Brodhead, the Second Comptroller, by allowing to each a credit for the amount of his deposit and charging the same over to the account of the bank receiver. But when the accounts of the disbursing clerks came before Mr. Tayler, the *196 First Comptroller, be took a different view of bis powers. In a letter addressed to tbe Secretary of tbe Treasury, he says:
“It has not, to my knowledge, been regarded as within tbe powers of tbe accounting officers to credit a disbursing officer, except for moneys properly disbursed and moneys restored to tbe Treasury. They are not authorized to allow credits for moneys lost without fault of the officer, not even though he be captured by tbe enemy, and tbe money seized as captured.
“Tbe authority to allow such claims was in Congress alone, which retained exclusive jurisdiction until the passage of tbe act of May 9, 1866, when jurisdiction in such cases was conferred upon the Court of Claims.
“ I am of opinion that Mr. I-Iobbs can obtain relief only by application to Congress or to tbe Court of Claims.
“I am, very respectfully,
“B. W. Tayleb.,
“Comptroller.”
In accordance with this suggestion, the claimant comes to this court and prays for a decree that will authorize the accounting officers to allow a credit in tbe stettlement of bis accounts equal to tbe amount of his loss. *
The defendants interposed three objections:
First. “The loss,” say they, “was not without fault or negligence on the part of the claimant.”
The only fault or negligence complained of is the fact that he deposited the money in a bank designated by. the Secretary as a depository of public money, when he might have deposited it in the' Treasury. That in itself was not a fault. It was strictly according to law. The Act March 3, 1857 (11 Stat. B., 243), authorized and required him to deposit in the Treasury or some public depository. The law does not provide that this compulsory choice should be at his peril. If he made it in good faith, without knowledge or suspicion of the bank’s insolvency, and without the expectation of gain or other private motive, he ought not to stand the loss. None of these things areproved or even alleged. “ But why,” it is asked, “ did he not keep his money in the Treasury?” Why, it may be asked in reply, did the Secretary of the Treasury select an outside depository? He not only selected outside depositories, but he encouraged disbursing officers to use them. In an official letter to the Treasurer, as appears in the second finding of fact, the Secretary said: “I desire that the national banks shall be employed as depositories of the public money, and they will be so employed upon their furnishing the securities required of them.
*197 The Secretary of tbe Treasury,” says tbelaw, “shall require the association, thus designated to give satisfactory security by the deposit of United States bonds or otherwise for the safe keeping and prompt payment of the public money deposited with it.” And when the Secretary announced that this bank “had complied with the requirements of the law and the regulations of the department” the claimant had a right to suppose not only that the bank had put up enough government bonds to make the deposit perfectly safe, but that in making it he was conforming to the policy of his official superior. If the disbursing clerk was in fault tlie Secretary was in greater fault. Indeed, the law, in imposing upon an officer this perilous choice, was in fault. At least, Congress seemed to think so, for they made haste to amend it. Confirmatory of the claimant’s honest intention, it may be observed that he followed the example of his immediate predecessor in the office, Hon. John J. Knox, the present Comptroller of the Currency. Mr. Knox testifies that he kept the public money in a “ designated depository,” outside of the Treasury. He found it more convenient and supposed it perfectly safe.
Under all these circumstances, we come to the conclusion that the loss accrued without fault or negligence on the part of the claimant.
Second. The claim, it is said, is barred by the statute of limitations.
The petition does not set up a “ claim, against the United States,” but rather a defense to a claim. The defendants intrusted the claimant with certain money and now call upon him to account for it. When he attempts to reply, the statute of limitations springs up to close his mouth. Injustice and equity the claim and defense should go together and be heard by the same tribunal. That undoubtedly is the general intention of the law. If suit were brought on the government claim in any other court the defense, however old, would be heard. No lawyer would think of pleading the statute. The trouble in this case grows out of the fact that the law sends the government claim to one tribunal for adjudication, and the defense to another. The First Comptroller passes upon the claim, this court upon the defense. We are forbidden to entertain claims more than six years old, but no time runs against the Comp *198 troller. It. can hardly be supposed that Congress intended any such one-sided trial. And the statutes are susceptible of an honester construction. The law of 1863 describes a money demand and calls it a claim. The law of1866 describes a prayer for relief from responsibility and calls that a claim also. If the status of a claim is to be determined by the description of it rather than by an accidental or convenient name given to it, this kind of claim is not barred by the statute. For, judging by the description, the claim which by the act of 1863 we are forbidden to entertain is not at all the claim which by the act of 1866 we are commanded to hear. This question was discussed by Judge Nott, in 11 C. Cls. It., 696, as follows:
“The statute of limitations uses the word ‘claim,’ when defining the subjects as to which a suit may be barred by lapse of time, and the Disbursing officers Act also uses the word ‘claim’ when defining the subject as to which relief may be sought under its provisions. But the statute of limitations forms a part of the amended Court of Claims act (12 Stat. L., 765, § 10), and thatact existed before theDisbursing officers Act, and the word ‘ claims ’ in it has been defin'ed by the Supreme Court to mean a money demand on contract. (Alire’s Case, 7 C. Cls. It., 28.) It is not to be doubted that subsequent subjects of jurisdiction would be subject to the provisions of the statute of limitations if they were in the nature of money demands against the government. But in the case now before us there is no debt owing from the government to the claimant, and no money demand asserted by the claimant against the government. All the world over, statutes of limitation are intended for cases where one man owes a debt to another, which the latter has neglected to prosecute within a reasonable time. They are intended for the protection of the debtor, who cannot compel a suit against himself, and are applied against the creditor who has purposely delayed to bring the controversy to judicial determination. In this case, if there be any debt owing, it is from the claimant to the government, and the anomaly is that it is the creditor who has had a cause of action which might have been asserted at any time, who is insisting that the statute of limitations should exclude a decision upon the merits. It is evident here that the government does not occupy the position of a debtor, and that it might have forced a judicial determination of the controversy at any time after the loss by bringing suit against the claimant upon the only existing cause of action. In view of these facts, and of the decision of the Supreme Court in Alire’s Case, we are inclined to hold that the statute of limitations is not applicable to this class of cases, and that the purpose of the Disbursing officers Act was merely to secure the judicial ascertainment of a fact pending the settlement of an officer’s accounts at the Treasury, so as to inform *199 the accounting officers, who have no means for the ascertainment of such facts, whether or not a particular credit should be allowed to the party.”
Upon this view of the law, this court based a decision which was taken to the Supreme Court and affirmed. (96 U. S. B., 37.) In pronouncing the opinion of that court, Justice Miller says:
“ ‘Every claim against the United States cognizable in'the Court of Claims shall be forever barred, unless the petition is filed * * * within six years after the claim first accrues.’ (Bev. Stat., § 1069.) The petition of plaintiff in this suit does not, in the just sense of the word, set forth a claim against the United States. It sets up a defense to a claim of the United States against the plaintiff. The Court of Claims finds that plaintiff is now sued in another court of the United States for the sum in controversy here.
“The plaintiff asks, and by the very terms of the statute under which the Court of Claims acts can obtain, no judgment for money against the United States, nor fix any liability on the government to pay him anything. By a very curious provision, the Court of Claims is authorized to establish for him a defense to a claim, which claim the government can only establish judicially in some other court. If that court could entertain jurisdiction of this matter when offered as a defense, it is very clear that the statute of limitations would be no bar to such defense there. Why should it be here? We think it is a principle of general application that so long as a party who has a cause of action delays to enforce it in a legal tribunal, so long will any legal defense to that action be protected from the bar of the iapse of time, provided it is not a cross-demand in the nature of an independent cause of action.”
Supported by these decisions and argument, this court feels justified in deciding that as long as the government holds disbursing officers responsible on the books of the Treasury Department for losses “ by capture or otherwise,” and refuses or neglects to bring suit in a court where their defense can be heard, so long will the right survive to petition this court for relief.
But the claimant makes a further reply to the plea of the statute, which, in justice to. the case, ought to be considered. The first account stated against him on the books of the department, prior to 1871, was for the whole amount of the deposit. Subsequently dividends amounting in all to $6,484 89 were made by the receiver of the bank. A more formal account, in which all these dividends were credited, was made up February 21,1878. Of this balance he was notified March 7,1878. *200 The attorney for the claimant takes the position that if the statute of limitations applies to this case at all, it would only begin to run from February 21, 1878, and the court so decides.
Third. It is urged that this court has no jurisdiction of the case.
The Act May 9,1866 (Rev. Stat., § 1059), among other things provides that this court “shall have jurisdiction to hear and determine the claim of any paymaster, quartermaster, commissary of subsistence, or other disbursing officer of the United States for relief from responsibility on account of capture or otherwise, while in the line of his duty, of government funds * # * for -which such officer was, and is, held responsible.’ ’ (Rev. Stat., §1059, ¶ 3.)
It is shown in the findings of fact that the claimant was a “disbursing officer of the United States;” that as such he was intrusted with “government funds;” that in pursuance of law “in the line of his duty,” he deposited the same in a government depository, and that the same was lost, not by “capture,” but in another way; that is, “ otherwise,” to wit, by the failure of the depository. These are all the facts required to give this court jurisdiction.
From the fact that Army and Navy officers are mentioned in the law and that the word “capture” and, again, the words “in tbe line of his duty” are employed, it has been inferred that it was intended for the relief of military officers only. If we may suppose that a bill for that purpose only was originally drawn, and that on its way through Congress the words “or other disbursing officer” and “or otherwise” were inserted, it would account for any supposed incongruity of 1 an gua ge. However that may be, these words are in the law. They cover the claimant’s case, and the court is bound to give them effect. The decision in Sail’s Case (9 C. Gis. R., 270), cited by the defendants, has little relevancy to this case. The court there held that a depository having paid a check forged against a paymaster could not make that officer responsible for the forgery, and therefore the paymaster sustained no loss.
A decree will be entered in the usual form directing the proper accounting officers of the Treasury to allow to the claimant, as credit in the settlement of his accounts for government funds deposited by him in the Merchants’ National Bank of Washington, April 27, 1866, and lost by the failure of the bank May 4, 1866, the sum of $18,715.11