OPINION.
Scoeield, J.,
delivered the opinion of the court:
In July, 1868, John Scott, the claimant, then a second lieutenant in the United States Army, was appointed post quartermaster, acting assistant commissary of subsistence, and post treasurer, and assigned to duty at Fort Fred Steele, in Wyoming Territory. For the safe-keeping of the public money with which he might be intrusted, he was furnished by the Government with a small iron field safe. He kept the safe in his tent. It was there on the evening of September 4, 1868, and gone on the next morning. During the night some of the tent ropes had been cut, the safe pulled out and carried off. It was fouud during the day some distance from the camp. The bottom was broken in as if with a sledge-hammer, and most of its contents removed. The sum of $184.66, which had been placed in the top of the safe, above a cheek-book and papers, had not been taken. On the evening of September 4,1868, the safe contained $2,007.80 belonging to the Government, and *6 $650 belonging to claimant. The $184.65 not taken belonged to the Government. The sum of $1,823.15 of public money and $650 of his private funds were stolen.
Claimant, in his account-current with the Department, reported the loss and claimed a credit for $1,823.15, “stolen with the field safe September 4, 1868.” The claimant has ever since remained in the United States Army, but his accounts have never been settled nor this item acted upon until April 18,1882. At that time the Third Auditor decided and informed him by letter that—
The accounting officers had no authority to allow credits for money lost or stolen from disbursing officers, and that claimant would continue to be held accountable for the amount until relieved by an act of Congress or a decision of the Court of Claims.
Anticipating that this might be the ruling in the Department, claimant had already filed in this court his petition for relief. The Revised Statutes give this court jurisdiction as follows:
Sue. 105Í). *******
The Court of Claims shall have jurisdiction to hear and determine the claim of any paymaster, quartermaster, commissary of subsistence, or other disbursing officer of the United States for relief from responsibility on account of capture or otherwise, while in the line of his duty, of Government funds * * * for which such officer was, and is, held responsible.
Sec. 1062. Whenever the Court of Claims ascertains the facts of any loss by any paymaster, quartermaster, commissary of subsistence, or other disbursing officer in the cases hereinbefore provided, to have been without fault or negligence on the part of such officer, it shall make a decree setting forth the amount thereof, and upon such decree the proper accounting officer of the Treasury shall allow to such officer the amount so decreed, as a credit in the settlement of his accounts.
The character of the claim and the official position of the claimant come within the requirements of this law. He was a disbursing officer, with government funds in his possession and in the line of his duty when the loss occurred.
It is argued by counsel for the Government that the claim is barred by the statute of limitations.
The loss occurred September 4,1868. The decision of the accounting officer against allowing the credit was made April 18, 1882. Claimant’s petition for relief was filed in this court July 7,1879. The statute of limitations as set forth in Revised Statutes, sec. 1069, is as follows:
Every claim against the United States, cognizable by the Court of Claims, shall be forever barred unless the petition setting forth a statement thereof is filed in the court * * * within six years after the claim first accrued.
*7 The questions whether the petition of a disbursing officer for relief against a claim by the Government is itself a claim within the meaning of this act, and, if so, when the statute begins to run against it, have several times been the subjects of consideration and decision, both in this court and the Supreme Court. (Clark's Case, 11 C. Cls. R., 698; Hobbs’s Case, 17 C. Cls. R., 189; United States v. Clark, 96 U. S. R., 37; United States v. Smith, 105 U. S. R., 620.) These decisions are to the effect that it does not become a claim within the meaning of the law until there has been, on the part of the Government, some authoritative demand for payment, or a refusal to allow the credit, and only from the time of such demand or refusal does the statute begin to run. Justice Miller, in delivering the opinion of the court in the last-cited case, and commenting upon the facts in Clark’s Case, says:
Iu Clark’s Case the money had never keen paid by him to the Treasury, nor did it appear that there had been any final refusal by the accounting officers of the Treasury to allow the claim. * * * The court there said that until the accounting officers had refused to allow the claim in his accounts, there was no occasion to establish it in the Court of Claims. There being no denial of his right, the statute did not run. This was founded on the conditions of the officer’s bond to pay when demanded. It sufficiently appears in this [Smith’s] case that claimant’s right was authoritatively denied when he was ordered by the Paymaster-General to pay the money, and that then was the proper time to apply for the protection of the Court of Claims by asking its decree that he should be credited on his account with that sum.
In this case it does not apx>ear that there was any authoritative demand for payment, nor a refusal to allow a credit in the accounts of the claimant, until April 18, 1882. The claimant’s case, therefore, coming clearly within the rule laid down in the most recent decision of the Supreme Court, is not cut off by the statute of limitations.
Counsel also claim that the loss was not without fault or negligence on the part of the claimant.
The fifth finding of facts sets out that the loss occurred without fault or negligence on the part of the claimant. This finding is the conclusion of the court from many facts set out in the findings. From the claimant’s surroundings he had every reason to feel that the treasure was safe where it was. A military camp in Wyoming Territory is necessarily isolated and distant from the haunts of expert thieves. The officers’ tents, including the claimant’s, were located in the center of the camp. A *8 special sentinel was stationed to watch over them. Surrounding them was a circle of tents in which the soldiers slept. Around and outside of all, to protect the camp from intruders and out-goers, was a regular detail of soldiers. The fort had been recently established and no buildings of any kind had as yet been erected. The safe was therefore placed in claimant’s tent, a few feet from his bed. It weighed about 175 pounds, and was securely locked. It was hardly to be apprehended that thieves could pass the outside guard, through the line of sleeping soldiers, escape the observation of the special sentinel, cut the tent ropes, drag out the safe, and retreat with their burden undiscovered. It is easy after a loss has occurred to see how it might possibly have been avoided, but it is not so easy to anticipate and guard against the danger. That it is not in human nature to be ever apprehensive, vigilant, and guarded at all points against the devices of daring and ingenious men who study and practice crime is abundantly illustrated by the history of burglaries, robberies, and thefts all over the world.
A decree will be entered in the usual form directing the accounting officers of the Treasury Department to allow to the claimant as a credit in the settlement of his accounts for government funds stolen from the field safe at. Fort Fred Steele, Wyo., September 4,1868, the sum of $1,823.15.