# NEW ORLEANS v. WARNER.

## CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE FIFTH CIRCUIT.

No. 172. Argued March 13, 1899. — Decided November 13, 1899.

Following the decisions of the Supreme Court of Louisiana, this court holds that the drainage warrants of the city of New Orleans, in question in this case, being neither bills of exchange, nor promissory notes, nor notes pay-

# NEW ORLEANS *v.* WARNER. 121

able to order or bearer, nor effects negotiable by indorsement or delivery, are not included within the terms of Article 3540 of the Civil Code of Louisiana, prescribing certain actions therein named; and are not prescribed by the statutes of that State.

The city of New Orleans, having voluntarily assumed the obligations of a trustee with respect to the fund to be raised by the collection of drainage assessments, cannot set up the prescription contained in Article 3547 of the Code against an application which, as such trustee, it had undertaken and had failed to perform — the rule being well settled that, in an action by a *cestui que trust* against an express trustee, the statute of limitations has no application, and no length of time is a bar.

It is immaterial whether the assessments against the city itself for the drainage of public property were reduced to judgments or not: by reducing its own claim to judgment, it neither ceased to be debtor nor trustee.

The judgment and decree in *Peake* v. *New Orleans*, 139 U. S. 342, cannot be considered as a controlling authority in this case, the facts being different, as shown in the opinion of the court in this case; and it would be inequitable to permit the city to set up that decision as an excuse for its failure to collect these assessments.

A judgment for taxes does not differ from any other judgment in respect to its conclusiveness, and the city of New Orleans cannot, after the lapse of more than twenty years, question its liability upon the judgments against it for the amount of these assessments.

It was the intention of the amendment of 1874 to the constitution of Louisiana, limiting the power of New Orleans to contract debts thereafter, to validate the issues of drainage warrants, some of which are questioned in this suit, not only for the work done, but for the property purchased by the city, in case it should elect to do the work itself.

The fact that the city chose in 1876 to pay for property which Van Norden bought from the Ship Canal Company in 1872 six times as much as he then paid for it, is one that cannot be considered here; as, from the decision in *Fletcher* v. *Peck*, 6 Cranch, 87, to the present time this court has uniformly refused to inquire into the motives of legislative bodies.

The objection that the decree finds the city a debtor to the complainant in the amount of the warrants is more apparent than real, since it also declares that he is entitled to be paid out of the drainage assessments, refers it to a master to state an account of such assessments, and provides for an absolute decree against the city only if the fund established by the accounting shall be sufficient, and for a *pro rata* decree if such fund be not sufficient to pay all the warrant holders in full.

The liability of the city to pay interest was conditioned upon the presentation of the warrants and the indorsement upon them of the date of such presentation; but the commencement of suit was a sufficient demand to charge the defendant the interest from that day, at the rate specified in the contract.

THIS was a bill in equity filed November 26, 1894, in the Circuit Court for the Eastern District of Louisiana by John G. Warner, a citizen of the State of New York, on behalf of himself and all other parties holding obligations of the same nature and kind as himself, to charge the city of New Orleans as the debtor of specific taxes, averred to have been levied by lawful authority, for the payment of certain warrants issued for the purchase of a drainage plant and franchise, the collection of which was made the duty of petitioner by statutes hereinafter set forth. A liability on the part of the city was averred as a result of a contract alleged to have been broken by it, and a disregard and violation of duties imposed upon it by statute, as to the prosecution of the work of drainage, and the collection of assessments therefor.

The facts of the case are so fully set forth in the cases of *Peake* v. *New Orleans*, 139 U. S. 342, and *Warner* v. *New Orleans*, 167 U. S. 467, that a succinct statement of such facts, taken largely from the opinion of the Circuit Court of Appeals, is all that is deemed necessary here.

By an act approved March 18, 1858, the legislature of Louisiana provided for a system of draining certain lands within the city of New Orleans and elsewhere, which was to be carried out by boards of commissioners appointed for the three districts into which the territory was divided. The act further provided for plans of the work to be prepared by the commissioners, for assessments to be levied upon the lands benefited, and for the entry of judgments decreeing the lands to be subject to a lien for such amount as might be assessed.

By a supplemental act, approved March 17, 1859, the boards of commissioners were authorized to borrow money to carry on the work, and to issue bonds therefor. It was contemplated that the money should be raised at once for the payment of the work, in anticipation of the collection of the assessments.

By an act approved March 1, 1861, the prior acts were amended by providing for a summary mode of collecting the assessments, authorizing the commissioners to apply to certain courts for the approval and homologation of the assessment rolls, which approval and homologation the act declared

"shall be a judgment against the property assessed and the owners thereof, upon which execution may issue in the ordinary mode of proceeding."

The commissioners made plans of the work proposed to be done, including therein the streets, squares and public places within the several districts, as the property of the city of New Orleans, and from time to time judgments were rendered charging these public places, as well as private property, with the amounts that had been assessed for drainage purposes. The city was named as the owner of these public places in the tableaux, and judgments were rendered against it as such owner for sums amounting in the several districts to $719,926.63.

On February 24, 1871, the legislature passed an act entitled "An act to provide for the drainage of New Orleans." This act abolished the several boards of drainage commissioners, transferred their assets to the Board of Administrators of the city of New Orleans, subrogated this board to all the rights, powers and facilities then possessed by the commissioners, directed it to collect the balance due on the assessments as shown by the books of the drainage districts, "which said assessments are hereby confirmed and made exigible at such time and in such manner as the Board of Administrators may designate." It further authorized the Mississippi and Mexican Gulf Ship Canal Company to undertake the work of draining the city, required the Board of Administrators to place all collections of drainage assessments to the credit of such company and hold the same as a fund to be applied to the drainage of New Orleans and Carrollton. Under these and the prior acts, assessments were made and reduced to judgment against the city on the area of the streets and other public places within the drainage districts, to the amount of $696,349.30, and against private persons to the amount of $1,003,342.98, of which about $330,000 have been collected from private property in cash and drainage warrants, leaving outstanding at the date of the filing of the bill in this case uncollected assessments to the amount of $1,469,714.47, of which the city owes $696,349.30.

By an act passed February 24, 1876, after more than two

thirds of the drainage system had been completed, the city of
New Orleans was authorized to purchase, if the common coun-
cil deemed it advisable, the property and franchises of the
Ship Canal Company or its transferee, including all tools, im-
plements, machines, boats and apparatus belonging to said
company or its transferee, on a valuation to be fixed by ap-
praisers to be appointed by the common council, the amount
to be paid in warrants drawn against the drainage assess-
ments. It further provided that the city should have exclu-
sive control of all the powers and franchises granted to the
Ship Canal Company, and should alone have the power to do
all the drainage work required to be paid for by assessment
upon property or from the city treasury. Meantime, how-
ever, the Ship Canal Company, having become embarrassed,
on May 22, 1872, assigned all its rights to Warren Van
Norden.

Acting under the authority of this act of February 24, 1876,
the city accepted the option, appointed an appraiser of the
property of the Ship Canal Company, and authorized the
mayor to purchase of said company, or its transferee, all its
property, and to stipulate for a full settlement of all its claims
for damages. Thereupon the mayor entered into a contract
with the Canal Company and with Van Norden, its transferee,
for the purchase of their property and the relinquishment of
all their claims for damages, for the sum of $300,000, payable
in drainage warrants. In this contract of sale the city cove-
nanted and agreed "that the existing rights and powers of
the holders of drainage warrants, under the civil acts of the
legislature of this State relative to drainage and drainage as-
sessments, shall remain unimpaired, and that the drainage tax
and assessment shall be administered, collected and paid" in
the manner and under certain terms specified, and that "the
collection of drainage assessments shall be assigned to an offi-
cer, who shall be selected by the said W. Van Norden and be
confirmed by the city council." The city further agreed "not
to obstruct or impede, but, on the contrary, to facilitate, by
all lawful means, the collection of the drainage assessments
as provided by law, until said warrants have been fully paid,

it being well understood by and between the said parties hereto that collections of drainage assessments shall not be diverted from the liquidation of said warrants and expenses as hereinabove provided for, under any pretext whatsoever, until the full and final payment of the same."

The bill, after reciting these facts, averred in substance that upon acquiring the drainage plant and franchises of the canal company the city abandoned all drainage work and suffered the dredge boats and machinery purchased as above stated to decay and become valueless, and that, by reason of the city's failure to complete the drainage and benefit the lands, the courts have refused to enforce the collection of the assessments ; that, having thus abandoned all drainage work, the city, by its ordinances and by a proclamation of the mayor, then advised property holders not to pay the assessments, and that, in consequence of these ordinances and said proclamation and the decisions of the courts, the drainage assessments became practically valueless and uncollectible. The bill further averred that the city had issued bonds in exchange for drainage warrants given for work done prior to the sale, under the authority of the act of the legislature of 1872, to an amount in excess of all the drainage assessments, which it will claim operated as a discharge of its liability, as assessee of the streets, etc., and of all liability it may have incurred by any dereliction of duty in regard to the assessments against private property, but that this claim was not made known to Van Norden at the time of the purchase, and that he would not have parted with his property for a consideration payable out of drainage assessments, if he had known that such claim would be set up to defeat the payment of the price. The bill closed with a prayer for an accounting of the drainage fund, including the amounts due by the city and the application thereof to the payment of the complainant's warrants and those held by others similarly situated who might come in and avail themselves of the benefits of the bill.

To this bill the defendant demurred for want of jurisdiction and of equity, and because the matters sought to be litigated had been decided adversely to complainant's pretensions by

the Circuit Court in the case of *Peake* v. *New Orleans*, and
by the Supreme Court on appeal in the same case, 139 U. S.
342. This demurrer was sustained, the bill dismissed by the
Circuit Court, and the case carried to the Circuit Court of
Appeals for the Fifth Circuit. That court, being in doubt as
to the application of the *Peake case*, certified to this court the
questions : First, whether the city, under the warranties, ex-
pressed and implied, contained in the contract of sale of June
7, 1876, by which it acquired the property and franchise from
Warren Van Norden, was estopped from pleading against the
complainant the issuance of bonds to retire $1,672,105.21 of
drainage warrants, issued prior to said sale, as a discharge of
its obligation to account for drainage funds collected on pri-
vate property, and as a discharge of its own liability to that
fund as assessee of the streets and squares; and, second,
whether the decision in *Peake* v. *New Orleans* should be
held to apply to the facts of this case and operate to defeat
complainant's action.

The first of these questions this court answered in the affir-
mative; the second it declined to answer. *Warner* v. *New
Orleans*, 167 U. S. 467.

Thereupon the Court of Appeals held that the city was
estopped from pleading the issue of the bonds, and that the
*Peake case* did not necessarily apply to the facts of this case,
nor operate to defeat the plaintiff's action. The decree of the
Circuit Court sustaining the demurrer was reversed, and the
case remanded with instructions to proceed to a decision upon
the merits. 52 U. S. App. 348.

The case subsequently went to a hearing upon the plead-
ings and proofs in the Circuit Court, and resulted in a decree
dismissing the bill. Thereupon an appeal was taken to the
Circuit Court of Appeals, which reversed the decree of the
Circuit Court and remanded the case to that court with direc-
tions to enter a decree that the city was indebted to Warner
in $6000 with eight per cent interest from June 6, 1876, to
be paid out of the drainage assessments set forth in the bill ;
that such assessments, including those against the city, as the
owner of its streets and squares, constituted a trust fund in

the hands of the city for the purpose of paying complainant and other holders of the same class of warrants, and that the case be referred to a master to state an account. Whereupon the city applied for and obtained a writ of certiorari from this court.

*Mr. Branch K. Miller* for the city of New Orleans. *Mr. Samuel M. Gilmore* was on his brief.

*Mr. Wheeler H. Peckham* for Warner. *Mr. Richard De Gray* filed a brief for same. *Mr. J. D. Rouse* and *Mr. William Grant* also filed a brief for same.

MR. JUSTICE BROWN, after making the above Statement of the Case, delivered the opinion of the court.

Nineteen assignments of error were filed in this case, but we shall only notice such as were pressed upon our attention in the oral arguments or in the briefs of counsel.

1. That this suit was, at the institution thereof, prescribed by the statutes of Louisiana. In this connection reference is made to Articles 3540, 3544 and 3547 of the Civil Code.

Article 3540 provides that "actions on bills of exchange, notes payable to order or bearer, except bank notes, those on all effects negotiable or transferable by indorsement or delivery, and those on all promissory notes, whether negotiable or otherwise, are prescribed by five years," etc. Even though it could be assumed in this case that this bill was an "action on" these drainage warrants, we think they do not fall within the description of either of the instruments specified in Article 3540. These warrants are in the form of an order, drawn by the Administrator of Accounts upon the Aministrator of Finance, directing him to pay to the order of W. Van Norden, transferee of the Mississippi and Mexican Gulf Ship Canal Company, a certain amount "out of any funds in the city treasury to the credit of said company." They also contain the following memorandum: "This warrant is issued in accordance with the provisions of Act 30 of the session of the General Assembly of the State of Louisiana, held in the year

1871, and the Administrator of Finance, on presentation to him of this warrant, will pay the same in cash, in case there be any funds in the city treasury to the credit of the said Mississippi and Mexican Gulf Ship Canal Company; but should there not be sufficient funds to cash this warrant then the Administrator of Finance is required to indorse upon the same the date of its presentation, and this warrant shall bear interest at the rate of eight per cent per annum from and after the date of such presentation and indorsement until paid."

This instrument is neither a bill of exchange, a promissory note, a note payable to order or bearer, nor an effect negotiable by indorsement or delivery. The construction given to Article 3540 by the Supreme Court of Louisiana confines it to unconditional promises to pay a fixed sum of money on a day certain, whether the obligation be negotiable under the law merchant or not. Conditional obligations which lack these essential characteristics do not come within its provisions. *Baird* v. *Livingston*, 1 Rob. (La.) 182; *Bank of Louisiana* v. *Williams*, 21 La. Ann. 121; *Thompson* v. *Simmons*, 22 La. Ann. 450; *Jouett* v. *Erwin*, 9 La. Ann. 231; *Gasquet* v. *Directors*, 45 La. Ann. 342; *King Iron Bridge Co.* v. *Otoe County*, 124 U. S. 459.

As these warrants were not only payable out of a particular fund to the credit of the Canal Company, but were only payable when there were funds to the credit of such company, we think it entirely clear that they are not included within the terms of Article 3540.

We are also referred to Article 3544, prescribing, "in general, all personal actions, except those before enumerated," by ten years, and to Article 3547, which enacts that "all judgments for money, whether rendered within or without the State, shall be prescribed by the lapse of ten years from the rendition of such judgments. Provided, however, that any party interested in any judgment may have the same revived at any time before it is prescribed," etc., in which case it "shall continue in full force for ten years from the date of the order of court reviving the same." This latter article is

supposed to be applicable to the homologation of the several assessment rolls against the city as well as against private parties, which, under the act of March 1, 1861, were declared to be judgments against the property assessed and the owners thereof, upon which execution might issue in the ordinary mode of proceeding. These homologations or judgments were rendered at the suit of the commissioners of the drainage district, or the city itself, at various times from 1861 to 1875.

But we think a decisive answer to the argument upon both these articles is found in the contract of June 7, 1876, wherein the city purchased of Van Norden the drainage plant, and contracted "not to obstruct or impede, but, on the contrary, to facilitate, by all lawful means, the collection of the drainage assessments as provided by law until said warrants have been fully paid, it being well understood and agreed by said parties thereto that collections of drainage assessments shall not be diverted from the liquidation of said warrants and expenses as hereinabove provided for, under any pretext whatsoever, until full and final payment of the same." In respect to this we adhere to the opinion pronounced by us when this case was first before this court, that the city in respect to this purchase acted voluntarily; that it was not, as had been held in the former case of *Peake* v. *New Orleans,* 139 U. S. 342, with respect to other warrants, a compulsory trustee, but a voluntary contractor; that as the fund was to be partly created by the performance by the city of a statutory duty, it could not deliberately abandon that duty, or take active steps to prevent the further creation of the fund, and then plead a prior issue of bonds as a reason for evading liability upon the warrants. As the city had paid for the property in warrants drawn upon a particular fund, it was under an implied obligation to do whatever was reasonable and fair to make that fund good. Certainly it could not so act as to prevent the fund being made good, and then require the vendor to look to the fund and not to itself. The duty of the city to collect these assessments was affirmed in *State ex rel. Van Norden* v. *The Mayor etc.,* 27 La. Ann. 497. See

also *Cumming* v. *The Mayor*, 11 Paige, 596; *Atchison* v. *Byrnes*, 22 Kansas, 65.

Having thus voluntarily assumed the obligations of a trustee with respect to this fund, it cannot now set up the statute of limitations against an obligation, which, as such trustee, it had undertaken and failed to perform. The rule is well settled that in actions by *cestuis qui trust* against an express trustee, the statute of limitations has no application, and no length of time is a bar. While that relation continues, and until a distinct repudiation of the trust by the trustee, the possession of one is the possession of the other, and there is no adverse relation between them. Perry on Trusts, § 863. In *Oliver* v. *Piatt*, 3 How. 333, 411, it is said that "the mere lapse of time constitutes of itself no bar to the enforcement of a subsisting trust; and time begins to run against a trust only from the time when it is openly disavowed by the trustee, who insists upon an adverse right and interest, which is fully and unequivocally made known to the *cestui que trust.*" To set the statute in motion the relation of the parties must be hostile, and so long as their interests are common, or their relations fiduciary, as in the case of landlord and tenant, guardian and ward, vendor and vendee, tenants in common, or trustee and *cestuis qui trust*, the statute does not begin to run. *Zeller's Lessee* v. *Eckert*, 4 How. 289; *Seymour* v. *Freer*, 8 Wall. 202; *Lewis* v. *Hawkins*, 23 Wall. 119. This doctrine has been applied in Louisiana in favor of an administratrix having claims against the estate, in which it is held that, as she cannot sue the estate, the statute will not run against her on her claims against the estate, so long as she is administratrix. *Succession of Farmer*, 32 La. Ann. 1037; *McKnight* v. *Calhoun*, 36 La. Ann. 408. A like ruling was made with respect to taxes levied for a particular purpose, as to which the city was held to be a trustee, in *School Directors* v. *Shreveport*, 47 La. Ann. 1310.

This trust has never been repudiated by the city. In fact, one of the defences set up in the answer was that the city had applied itself with great diligence, and to the full extent of its ability, to improve and make serviceable the drainage work

and to proceed with the collection of drainage taxes, and did all in its power to prosecute the collection of the same, extending the drainage work on its regular tax bills, which were asserted and claimed in every account filed in the courts by administrators, executors, syndics and other persons exercising like authority. By these modes and others, collections were made and accounted for. Indeed, the whole gist of the answer is that the city has executed its trust faithfully, so far as it was possible to do so, by collecting assessments against private persons, but has not accounted for taxes assessed against itself, because it is not legally responsible therefor. There is no claim throughout the answer that the city disavowed the trust.

At the time the assessment rolls were homologated and the judgments against the city were rendered, there was no claim made that the city was not responsible, or that the public grounds, streets and squares were not assessable for these improvements; and in so far as the collection of these judgments is concerned, the city stood in the same relation of trustee to the warrant holders which it did with respect to the assessments upon private property.

The argument that the city repudiated its trust by the abandonment of the work of drainage in 1876, is untenable. Indeed, by the very act of February 24, 1876, under which the city was authorized to purchase the Canal Company's plant, the city was given exclusive control of all the rights, powers and franchises formerly invested in the Canal Company, and authorized to do all the drainage work required to be paid for by assessments upon property, or from the city treasury. What was this purchase made for if not to continue the drainage work? It can scarcely be supposed that the city purchased this plant with a view of discontinuing such work. If it were abandoned at that time it might readily be supposed that such abandonment was temporary, and that the purchase was made in good faith, and for the purpose for which it should have been purchased, namely, the prosecution of the work.

We deem it entirely immaterial whether the assessments

against the city for the drainage of public property were reduced to judgments or not. When put in this form they were none the less obligations of the city — debts which it owed to the drainage fund — was bound to treat as assets collected, and such as were held by it as trustee for the benefit of the warrant holders. Perry on Trusts, § 440; *Stevens* v. *Gaylord*, 11 Mass. 256; *Sigourney* v. *Wetherell*, 6 Met. (Mass.) 553, 557; *Leland* v. *Felton*, 1 Allen, 531, 533. The debts of private owners it agreed to use due diligence to collect, and as to these it was a trustee. Its own debts it was bound to pay, and as to these it was equally a trustee. By reducing its own claim to judgment it neither ceased to be debtor nor trustee.

2. A defence of *res adjudicata*, not noticed by the court below, is set up as arising from the decree of the Circuit Court, affirmed by this court in the case of *Peake* v. *New Orleans*, 139 U. S. 342. This plea is based upon the fact that in that case one James Jackson appeared by intervening petition as the holder of eight purchase warrants, identical in character with those sued upon by the complainant — part of those given in payment of the purchase price of the drainage plant from the Canal Company and Van Norden; that the decree in the *Peake case* was a dismissal of complainant's bill and of all intervening petitions, and that the decree upon the warrants sued upon by Jackson was decisive of the whole series of purchase warrants. It is a sufficient reply to this plea to say that the complainant Warner was neither a party nor a privy to this litigation, and that the decree was binding only upon Peake and such others as actually intervened. *Hook* v. *Payne*, 14 Wall. 252. Indeed, the attempt to identify these warrants with those which were made the basis of Jackson's intervention was evidently an afterthought, as the city in its answer, while setting up the decree in the *Peake case*, makes no mention whatever of the intervening petition of Jackson, and relies upon the final decree of this court, 139 U. S. 342, which turns only upon defences applicable to the Peake claim.

But the case so far from being *res adjudicata* of this is not even a decisive authority. The complainant Peake was a holder of warrants issued to the Mississippi and Mexican Gulf

Ship Canal Company under the act of February 24, 1871, which authorized the Canal Company to undertake the drainage work, required the boards of drainage commissioners to transfer to the Board of Administrators all their assets, and required the latter to collect the drainage assessments and place them to the credit of the Canal Company. This court held that, under this act, the city, though a trustee, was a compulsory trustee and its obligations strictly statutory — such as placed upon the city only a limited responsibility for that which the Board of Administrators might do or omit to do; that it had been denuded by the legislature of all freedom of action; that it had no choice of contractor or price; that neither the property to be taxed nor the means or method of collecting its assessments were intrusted to its discretion, and that by providing an officer for the collection of the assessments it had discharged its duty in that particular. In the intervening petition of Jackson he avers that he is the holder of eight warrants, similar to those described in the bill of Peake, upon which he had obtained judgment; and it is only by looking at the original petition on the law side of the court that it appears that these warrants were issued in favor of Van Norden, transferee of the Ship Canal Company, and that they were indorsed by him. They were evidently treated by this court as standing upon the same footing as the Peake warrants. But however this may be, the whole opinion of this court is based upon the Peake warrants, which, as before said, were not purchase warrants at all, and no allusion is made in that opinion to the Jackson intervention.

In the case under consideration the complainant bases his suit upon $6000 of warrants given for the purchase of the drainage plant. The obligations of the city with respect to these are measured, not by the act of 1871, but by the act of February 24, 1876, authorizing such purchase, and by the contract of sale, wherein the city agrees to facilitate by all lawful means the collection of the drainage assessments, and to apply the same to the liquidation of these warrants. In respect to these warrants we held, when this case was first before this court, 167 U. S. 467, 477, that the city acted vol-

untarily ; that it was not, in reference to these warrants, as it was to those in the *Peake case*, a compulsory trustee, but a voluntary contractor; and that it could not, when purchasing property and contracting to pay for it out of a particular fund, and issuing warrants therefor payable out of ·such fund, deliberately abandon that duty, take steps to prevent the further creation of the fund, and plead in defence to a liability on the warrants that it had, prior to the purchase, paid off obligations theretofore created against the fund.

For these reasons we hold that there is not only no room for a plea of *res adjudicata*, but that the *Peake case* is not to be considered as a controlling authority.

' 3. The gravamen of the bill is that, after the purchase of the drainage plant, the city became possessed of the sole power of completing the system of drainage, that it became its duty to do so or to establish some other system; but that from the very date of the purchase the city ceased all work, sold some of the boats and machinery purchased, diverted the proceeds of taxes to other purposes than that of the payment of drainage warrants, allowed other boats to rot and sink, and also permitted the canal dug by the company to fill up with sediment.  Further, that the city did nothing to enforce payment and collection of the drainage taxes, but adopted an ordinance advising drainage taxpayers not to pay, whereby, by reason of her conduct in abandoning her system of ·drainage, the Supreme Court of Louisiana in *Davidson* v. *New Orleans*, 34 La. Ann. 170, decided that such taxes could not be enforced and collected.  That by this and other means it destroyed the drainage fund, until now the same has become unenforceable and worthless to the holders of the warrants.

In this connection the city averred in its answer that it had performed its full duty in relation to the collection of assessments against private property, but admits that the proclamation referred to in the bill advising property owners not to pay drainage assessments was issued by the mayor under authority of an ordinance of the city.  It further alleged that the drainage plans made by the Canal Company were so defective that their completion would have been of no benefit to the property

attempted to be drained; that the work done under them was also defective and of no value, and that for these reasons the city was justified in suspending the further prosecution of the work, which resulted in the decision of the Supreme Court in the case of *Davidson* v. *The City of New Orleans*, 34 La. Ann. 170, declaring judgments for drainage assessments void for failure of consideration, and that this decision had become the settled rule of law in the State, rendering further collections impossible; but that, notwithstanding this decision, the city had constantly and at all times endeavored in every way possible to realize the assessments; and the city filed an account showing the collections made in 1871 to June 20, 1891, inclusive, and the disposition thereof, as a sufficient compliance with its duty as trustee. The answer further set up and pleaded that the city had discharged itself from all liability for drainage taxes which it had collected, or ought to have collected, for the benefit of the warrant holders, by the issue and delivery of bonds to the amount of $1,672,105.21 to take up drainage warrants issued under the act of 1871, all of which were used and applied at various times between May 10, 1872, and December 31, 1874, to the redemption of drainage warrants.

That the city is estopped to plead the issue of bonds as a discharge of its obligation to the holders of these purchase warrants, was settled upon the prior hearing of this case. *Warner* v. *New Orleans*, 167 U. S. 467, 477. In this connection we said: "That one who purchases property, contracting to pay for it out of a particular fund, and issues warrants therefor payable out of that fund — a fund yet partially to be created, and created by the performance by him of a statutory duty — cannot deliberately abandon that duty, take active steps to prevent the further creation of the fund, and then, there being nothing in the fund, plead in defence to a liability on the warrants drawn on that fund, that it had prior to the purchase paid off obligations theretofore created against the fund."

Prior to the purchase of the Ship Canal Company's plant from Van Norden, the legality of these drainage assessments had been affirmed by the Supreme Court of Louisiana. *In the matter of the Commissioners of the First Draining District,*

27 La. Ann. 20. This was a proceeding by the City Board of Commissioners praying for the homologation of certain assessment rolls for drainage taxes, to which opposition was made upon different grounds. The court, however, sustained the assessments, and, in the opinion, remarked that " the State in ordering the draining, is exercising sovereign power, and can, of course, direct or authorize the work to be done in such way and compensation made on such terms as in its discretion may seem best, restrained only by the fundamental principles upon which the government is to be conducted, and we find nothing in them inhibiting the State from having the means provided for such a work, in the way it is done in the present system of drainage in the city of New Orleans. On this question we see no room for judicial interference with the discretion of the State, and we think the existing laws authorize the collection sought herein to be enforced." So far then, as the law is concerned, there would seem to have been no doubt of the validity of these assessments, had the city continued the work and lived up to the obligations of its contract with Van Norden.

With reference to its alleged neglect in this particular the Court of Appeals found that all the facts averred in the bill had either been admitted by the answer, or abundantly established by evidence. When the city purchased the drainage plant it seems to have been in good condition, and although the work had been about two thirds completed, the city not only abandoned the work but proceeded to disqualify itself from undertaking it. In April, 1878, an ordinance was adopted instructing the Administrator to advertise the dredge boats for sale. Although this does not seem to have been carried out, another ordinance was adopted in July requiring three boats, which were then in bad condition, to be broken up and the material stored. Subsequently, and in April, 1881, the mayor was authorized to issue and did issue a proclamation advising the people not to pay their drainage taxes until the question was decided by the Supreme Court, although the validity of these taxes had been determined in the case above cited. This expected decision was delivered in March, 1882,

in the case of *Davidson* v. *City of New Orleans*, 34 La. Ann. 170, in which the court found that, owing to the fact that plaintiff derived no benefit from the contemplated drainage, *the abandonment of all drainage work*, the disposal of all drainage apparatus, the impotency of the city to resume the enterprise, and the fact that the property assessed was worth but one tenth of the amount claimed, the taxes could not be collected. The prior case was cited, and the decision put upon the ground that " causes, occurring subsequently to the rendition of judgments, may render their execution illegal and inequitable, and violative of rights not within the contemplation of the court when the judgment was rendered, and not intended to be foreclosed thereby. . . . Here would be a failure of the only possible consideration of such judgments, and it could not be doubted that such failure would furnish just ground to enjoin their execution." But the court did not hold that the city itself could set up this defence — its own dereliction of duty.

We do not appreciate the equity of now permitting the city to set up this decision as an excuse for its failure to collect these assessments, since the decision itself is based upon the fact that the city had been derelict in abandoning the work, and failing to carry out in good faith its contract with Van Norden. The Court of Appeals further found that, so far as the answer attempted to fasten the responsibility for the alleged defects in the drainage plant upon Van Norden, its transferee, as a defence to this action, it was entirely unsupported by the evidence, as counsel for the city very frankly admitted in their argument at the hearing. Under the act of February 24, 1871, authorizing the Ship Canal Company to undertake the work, power was reserved to the City Board of Administrators to designate the location of the canals and levees to be built by the company, subject to certain specifications provided by the act, to build and run all the pumps and drainage machinery necessary to lift the water from the canals into Lake Pontchartrain, and to keep the water in the canals at the proper level for the work of excavation, and at the same time assist the drainage of the adjacent lands. It

was further made the duty of the City Surveyor to examine the work each month, certify to the Administrators of Accounts the number of cubic yards excavated and the number of yards of levees built, for which warrants were to be drawn upon the Administrators of Finance, and to be paid from the funds to the credit of the Canal Company. In fact, the city by ordinance located these canals, put the matter in charge of the Administrator of Improvements, and, through its officers, exercised supervision over the work. The testimony is that it was done strictly in accordance with the specifications furnished. If, as testified, it was not sufficiently extensive to meet the requirements of the city, or the plant was in any respect defective, such faults were due to the city itself, rather than to the contractors. In this connection the conclusion of the Court of Appeals was that the plan under which the work was done by the Canal Company and its transferee would, if carried out as contemplated, have sufficiently accomplished the drainage of the lands within the several districts to render the assessments available, if the city had kept the work in a serviceable condition, as the law required. Indeed, the fact that the city had abandoned the work, and, so far from facilitating by all lawful means the collection of the drainage assessments as provided by law, not only did nothing in this direction, but advised the taxpayers not to pay such assessments, is really too clear for argument.

4. If the city be not estopped, by consenting to the homologation of the assessment rolls — in other words, consenting to the judgments against itself — to question its liability for the assessments upon its streets, squares and other public places, or by drawing these warrants against the drainage fund, we think the validity of those assessments sufficiently appears from the opinions of the Supreme Court of Louisiana sustaining similar assessments upon public property. The argument is that public property, being exempt from taxation, is also exempt from these assessments; but the authorities have long recognized a distinction between general taxes, which are for the benefit of the public generally, and which in the nature of things the public must directly or indirectly pay, and spe-

cial assessments for the benefit of particular property, which are a charge upon the property benefited. If this be private property, then each owner of such property pays his share; if it be public property, the city pays it as the agent of the entire body of its citizens, who are assumed to have been benefited to that extent. *Charnock* v. *Levee Co.*, 38 La. Ann. 323.

This was apparently the view taken by the Supreme Court of Louisiana in the case of *The New Orleans Draining Co.*, 11 La. Ann. 338, 377, in which it is said of similar assessments that "the large portion of the expenses which, by this view, is thrown upon the city for the streets, meets in some measure that equity which has been urged upon our consideration, that as this work has been undertaken for the public good, the public ought to bear the charge of it, notwithstanding the benefit of it to the owners of the soil."

In *Marquez* v. *City of New Orleans*, 13 La. Ann. 319, property owners upon a certain street refused to pay more than one half of their assessments for paving, upon the ground that the city owned a promenade located in the centre of the street opposite the paved road. It was held that the city should pay one half of the entire cost of paving, upon the ground of its ownership of this public ground. This case was subsequently approved in the similar case of *Correjolles* v. *Succession of Foucher*, 26 La. Ann. 362, and in *Barber Asphalt Paving Co.* v. *Gogreve*, 41 La. Ann. 251, 259.

In the *County of McLean* v. *Bloomington*, 106 Illinois, 209, it was also claimed that public property, being expressly exempt from taxes, was also exempt from special assessments. But, said the court, "we have been too long and too firmly committed to the doctrine that exemption from taxation does not except from special assessments to now admit that it is even debatable. . . . The distinction between taxation and special assessment is also clearly made in our present constitution, and while providing that the General Assembly may exempt the property of the State, counties and municipal corporations from the former, section 3 makes no provision in regard to the latter, but, on the contrary, . . . authorizes the General Assembly to vest the corporate authority of cities,

towns and villages with power to make local improvements by special assessments without any restriction as to the property to be assessed." This ruling was followed in *Adams County* v. *Quincy*, 130 Illinois, 566; Beach on Pub. Corps. § 1172. The rule is different in Massachusetts, *Worcester County* v. *Worcester*, 116 Mass. 193, and perhaps also in Connecticut, *State* v. *Hartford*, 50 Conn. 89; but as this is a question of local law, we are bound by the Louisiana cases.

There is nothing in the several statutes of Louisiana upon the subject which indicate that private property only was intended to be affected. It is true that by the act of 1858, § 7, the District Court is empowered to decree that each portion of the property situated within the draining limits is subject to a first mortgage, lien and privilege in favor of the Board of Commissioners for such amount as should be assessed upon such property for its proportion of the cost of the draining; and that this was obviously intended not to apply to public property. But while it is doubtless true that public property was not intended to be chargeable with a lien under which it might be sold and title pass to private parties, it by no means follows that the city is not liable, and that in such cases the amount should not be paid out of the treasury. *Adams County* v. *Quincy*, 130 Illinois, 566. Indeed, something of this kind seems to have been contemplated in the act of February 24, 1876, § 4, where the city was given the power of doing all the drainage work "required to be paid for by assessments upon property, or *from the city treasury.*" This would seem to contemplate that the drainage work applicable to public property was to be paid for by the public out of the municipal treasury. Indeed, it is improbable that, if the cost of draining the streets and public squares was to be included in the proportion which each parcel of private property was to contribute as its share of the expense, no mention was made of this or of the manner in which the liability of each private owner for his proportion of the expense of draining the public property was to be ascertained. That the city was itself liable was evidently the view taken by the city officers when the assessment rolls were homologated.

One thing in this connection is certain. No general system of drainage could be established that did not include streets and public squares as a part of the territory to be drained. Assuming that no provision was made as to how the proportion applicable to public property was to be assessed and paid for, but that elaborate provision was made for the assessment of private property for its proportion of such expense, and for the creation of a lien therefor, enforceable by the courts, what follows? That private property was to be assessed for its contributory portion of a public expense? Not at all. Private owners may be assumed to be interested in draining their own property, but in the absence of a special provision to that effect there is no presumption that they are also to be called upon to pay that which *prima facie* belongs to the public. Indeed, in view of a recent decision in Massachusetts, it may well be doubted whether the legislature could impose the cost of draining public property upon private lot owners. *Sears* v. *Street Comrs.*, 53 N. E. Rep. 876. The expense of keeping streets in order is a public charge, and the same may be said of all other expenses which are for the benefit of the public. It is true that the expense of paving may be assessed upon the adjoining property upon the theory that such property is specially benefited by the improvement, but a special provision is necessary to create such charge.

As the Boards of Drainage Commissioners assessed the city for the expense of draining its public property, and the legislature approved all these assessments in the act of February 24, 1871, and the city subsequently assented to the homologation of these assessment rolls, except in the first district, and to judgments against itself for the amount of the assessments, it is difficult to see upon what principle it can now after a lapse of more than twenty years raise the question of its liability. We know of no reason why these judgments should not be treated as conclusive. A judgment for taxes does not differ from any other in respect to its conclusiveness. *United States* v. *New Orleans*, 98 U. S. 381; *Driggers* v. *Cassady*, 71 Alabama, 529, 533; *Cadmus* v. *Jackson*, 52 Penn. St. 295; Freeman on Judgments, § 135; *Mayo* v. *Foley*, 40 California, 281;

*Anderson* v. *Rider*, 46 California, 134; *Starns* v. *Hadnot*, 42 La. Ann. 366.

5. The only other assignment of error we are required to notice is that the court erred in holding that the constitutional amendment of 1874 (Laws of 1874, page 56, Joint Resolution No. 22), limiting the power of the city of New Orleans to contract debts, was not a complete defence to this suit. This amendment is as follows:

" The city of New Orleans shall not hereafter increase her (its) debt in any manner or form or under any pretext. After the first of January, 1875, no evidence of indebtedness or warrant for the payment of money shall be issued by any officer of said city except against cash actually in the treasury ; but this shall not be so construed as to prevent  .  .  .  the issue of drainage warrants to the transferee of contract under act No. 30 of 1871, payable only from drainage taxes, and not otherwise."

The argument is that the act of February 24, 1876, authorizing the purchase by the State of the drainage plant and franchise, is null and void, because it had the effect of increasing the debt of the city in violation of the supposed prohibition contained in said constitutional amendment of 1874.

At the time this amendment was adopted, the act of February 24, 1871, which provides for the drainage of New Orleans, was in force. This act authorized the Ship Canal Company to undertake the drainage of the city under the general direction of the Board of Administrators, and to provide funds for the payment of the work, directed the Boards of Drainage Commissioners to turn over to the Board of Administrators "all moneys, assessments and claims of drainage in their hands," including all judgments in favor of the commissioners, authorized the Board of Administrators to collect from the holders of property within the draining districts the balance due on the assessments, as shown by the books, " which said assessments are hereby confirmed and made exigible, at such time and in such manner as the Board of Administrators may designate ; provided, that the said board shall collect the said assessments herein authorized in time to

provide for the payment of the warrants to be issued to the said company at the date of their issue," and place all collections to the credit of the Canal Company for the drainage of the city.  The Ship Canal Company, having become embarrassed by the want of funds in the city treasury to pay the drainage warrants, on May 22, 1872, made a contract with Van Norden, by which he agreed to advance to the Canal Company $150,000 to meet the expenses of doing the work, upon condition of being reimbursed out of the warrants and money which might be obtained from the city of New Orleans, and to secure the same the company assigned to him all moneys, profits and benefits that were to be realized by the execution of the work, as well as all certificates and warrants to be received, with authority to collect them.  Subsequently, and on November 22, 1872, the company assigned all its property to Van Norden, acknowledging an indebtedness of $161,962.86 for moneys advanced.  At the time the constitutional amendment went into effect the work was being carried on by Van Norden under the above contracts with the Ship Canal Company.

The assessments, both against the city and individuals, which constitute the debt from which the warrants are to be paid, were all in existence long prior to this amendment, and were reduced to judgments at sundry times from 1861 to 1873. It seems, however, that the city concluded to do this work itself, and applied to the legislature for authority to purchase of Van Norden his drainage plant and to undertake itself to do the drainage work.  This authority was granted by the act of February 24, 1876, under which the contract was made with Van Norden to purchase the plant, and to pay therefor the sum of $300,000 in drainage warrants as a consideration for the property, and also in full settlement of all claims for damages which the Canal Company or Van Norden had against the city.  To provide for the payment of these warrants the city agreed that the rights of the holders of such warrants should remain unimpaired, and that the drainage taxes should be administered and paid under certain conditions, and their collection assigned to an officer to be selected

by Van Norden, — the city agreeing, as heretofore stated, to put no obstacle in the way of such collections.

We think it was the intention of the constitutional amendment to validate the issue of the drainage warrants to the transferee of the contract, not only for the work done but for the property purchased by the city, in case it should elect to do the work itself. The act of 1876 did not so much authorize an increase of the city's debt as a diversion of the warrants to the purchase of the drainage plant instead of a payment to the transferee for work done. We think the amendment should receive a construction commensurate with the object intended to be accomplished, namely, the drainage of the city, whether such drainage were carried out by Van Norden or by the city itself, and that it should not be limited to such warrants as were to be issued for the work. The debt for the assessments had already been incurred and put in judgment, and the amendment was intended to recognize the existence of such debt, and to provide that the warrants issued in payment of the same should not be treated as within the scope of the amendment. Beyond this, however, these warrants were to be issued not only in payment of the drainage plant but in settlement of Van Norden's claims against the city for damages connected with the failure of the city to carry out its contract with the Canal Company and Van Norden, which, in view of the fact that the drainage plant had been purchased by him for $50,000, may be assumed to have been the greater part of the consideration.

Indeed, it is open to serious consideration whether the reservation of drainage warrants in the constitutional amendment of 1874 was necessary, in view of the fact that the assessments had already been reduced to judgments against the city and the property owners, and that the further issue of drainage warrants was rather in the nature of the payment of a debt already incurred than the creation of a new obligation. There can be no question that the amendment was not designed to impair the validity of a debt already legally incurred, and that if it had attempted that, it would have been hostile to the provision of the Federal Constitution against impairing the obligation of a contract.

6. It is scarcely necessary to say that the fact that the city chose to pay $300,000 in 1876 for property which Van Norden bought in 1872 from the Ship Canal Company for $50,000, is not one which can be considered here. The act of 1876, authorizing the purchase and the settlement of claims against the city, provided for the appointment of an appraiser to estimate the value of the rights and things to be purchased or settled for. This appraiser was appointed and appraised the dredge boats and machinery at $153,750, being twenty-five per cent less than the original cost. He announced himself 'as unable to come to a conclusion with reference to the damages claimed. It must be borne in mind that the consideration of $300,000 was fixed upon not only to cover the value of the property of the plant, but the exclusive franchise under the act of 1871, and the claims for damages against the city.

It may be that the city made a bad bargain. It may be that it paid far more than the fair value of the property and claims purchased. It may be that the action of the common council was dictated by improper considerations, though this is rather hinted at than asserted; but from the case of *Fletcher* v. *Peck*, 6 Cranch, 87, 130, to the present time we have uniformly refused to inquire into the motives of legislative bodies. In this case Mr. Chief Justice Marshall, speaking for the court, observed : " That corruption should find its way into the governments of our infant republics, and contaminate the very source of legislation, or that impure motives should contribute to the passage of a law, or the formation of a legislative contract, are circumstances most deeply to be deplored. How far a court of justice would, in any case, be competent, on proceedings instituted by the State itself, to vacate a contract thus formed, and to annul the rights acquired under that contract by third persons having no notice of the improper means by which it was obtained, is a question which the court would approach with much circumspection. It may well bo doubted how far the validity of a law depends upon the motives of its framers, and how far the particular inducements operating on members of the supreme sovereign power of a State, to the formation of a contract by that power, are exam-

inable in a court of justice. . . . If the majority of the legislature be corrupted, it may well be doubted whether it be within the province of the judiciary to control their conduct; and if less than a majority act from impure motives, the principle by which judicial interference would be regulated, is not clearly discerned." See also *Ex parte McCardle,* 7 Wall. 506, 514; *Doyle* v. *Continental Ins. Co.,* 94 U. S. 535; *Soon Hing* v. *Crowley,* 113 U. S. 703; *United States* v. *Old Settlers,* 148 U. S. 427, 466; *United States* v. *Des Moines Navigation Co.,* 142 U. S. 510, 543. This is also the law in Louisiana. *Villavaso* v. *Barthet,* 39 La. Ann. 247, 258.

7. The objection that the decree finds the city a debtor to the complainant in the amount of the warrants is more apparent than real, since it also declares that he is entitled to be paid out of the drainage assessments, refers it to a master to state an account of such assessments, and provides for an absolute decree against the city only if the fund established by the accounting shall be sufficient, and for a *pro rata* decree if such fund be not sufficient to pay all the warrant holders in full.

There was no error in allowing interest except as to amount. The act of 1876, authorizing the city to purchase the drainage plant, declared that the consideration should be paid in drainage warrants, issued in the same form and manner as those theretofore issued under the act of 1871 for work done. This act of 1871 provided that if there should not be sufficient funds to cash the warrants when issued, the Administrator of Finance was required to indorse upon them the date of presentation, after which such warrants should bear interest at the rate of eight per cent until paid. The warrants also made this provision upon their face. But there was no presentation for payment as the statute and warrants required, and there was no waiver of such presentation. In 1876, it is true, the city abandoned the work, but the whole of complainant's case rests upon the theory that there was no repudiation of the trust, or of the obligation to do whatever was possible in the collection of the assessments. If, then, the trust continued so as to charge the city as trustee, the obligation of the complainant to take

such measures as were necessary to charge the city with interest also continued. But the liability of the city to pay interest was conditioned upon the presentation of the warrants and the indorsement upon them of the date of such presentation. While refusal to indorse the date, upon a proper presentation of the warrants, would not prevent the collection of interest, there must have been a presentation, or something equivalent thereto, before interest would begin to run. If the city had wholly denied the right of complainant, or distinctly refused to perform its obligation, or had wholly disabled itself from complying with its contract, a different question might have arisen, but the mere abandonment of the work was not sufficient to obviate the necessity of a demand. *Bérard* v. *Boagni*, 30 La. Ann. 1125.

But the commencement of suit was a sufficient demand to charge the defendant the interest from that day, *Fuller* v. *Hubbard*, 6 Cowen, 13, 22, at the rate specified in the contract. It is true, the cases of *Brewster* v. *Wakefield*, 22 How. 118; *Burnhisel* v. *Firman*, 22 Wall. 170, and *Holden* v. *Trust Co.*, 100 U. S. 72, hold that, where there is a promise to pay upon a certain day with interest at an exorbitant rate, the creditor is only entitled to interest after that time by operation of law and not by any provision in the contract; although if the local law be different, this court will follow it. *Cromwell* v. *Sac County*, 96 U. S. 51, 61; *Ohio* v. *Frank*, 103 U. S. 697. These very cases, however, recognize the principle that, if the parties themselves have fixed a rate to be paid up to the time of payment, that rate will be respected. In this case both the statute and the warrants provided that such warrants shall bear interest at the rate of eight per cent " until paid," and we are therefore of opinion that complainant is entitled to that rate from November 26, 1894, the date of filing the bill and issuing the subpœna.

While this opinion does not cover all the assignments of error, it disposes of all questions raised by counsel in their briefs, and

*Our conclusion is that the decree of the Court of Appeals be modified in respect of the date from which interest is to*

*be calculated, and as so modified affirmed, with costs of this court equally divided, and that the case be remanded to the Circuit Court for the Eastern District of Louisiana with a direction to comply with the decree of the Court of Appeals as modified, and it is so ordered.*

MR. JUSTICE WHITE and MR. JUSTICE PECKHAM did not sit in this case and took no part in its decision.