## SESE v. UNITED STATES.

### No. 634–52.

United States Court of Claims.

July 13, 1953.

Prew Savoy, Washington, D. C., C. T. Busha, Jr., and H. H. Martin, Washington, D. C., on the briefs, for plaintiff.

Thomas O. Fleming, Washington, D. C., Holmes Baldridge, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

Plaintiff, a citizen and resident of the Philippines, brings this suit to recover $54,500 plus interest thereon, alleged to have been loaned in 1943 to a recognized guerrilla unit known as Hunters ROTC Guerrillas.

■ Plaintiff's petition was filed in this court on December 31, 1952. Defendant has filed a motion to dismiss the petition on the ground that the claim urged therein is barred by the statute of limitations applicable to claims coming within the general jurisdiction of the Court of Claims, 62 Stat. 976, 28 U.S.C. (Supp. V) § 2501, because it was not filed within six years after the claim first accrued. In Marcos v. United States, 102 F.Supp. 547, 122 Ct.Cl. 641, we held that the wartime suspension of the statute of limitations in the Philippines was lifted on September 2, 1945, the date of formal surrender of the Japanese, 59 Stat. 1733, because access to this court by Filipinos had once again become possible.

Applying the rule of the Marcos case in Tan v. United States, 102 F.Supp. 552, 122 Ct.Cl. 662, certiorari denied 344 U.S. 895, 73 S.Ct. 275, we held that a petition filed on August 14, 1951, based on a cause of action accruing no later than November 3, 1941, was barred by the statute of limitations,[1] and that the pendency of Tan's claim before the Army Claims Service in the Philippines did not further toll the statute.

Plaintiff herein has urged this court to reconsider its decisions in Marcos and Tan in the light of cases and authorities not previously cited to the court and which plaintiff believes establish (1) that his cause of action did not actually accrue until a date well within the statutory period as determined by the Marcos case, and (2) that in any event, if the cause of action should be held to have accrued prior to September 2, 1945, the suspension of the statute of limitations was not lifted until at least December 31, 1946, the date of the President's Proclamation No. 2714, 61 Stat. 1048, 50 U.S.C.A.Appendix, § 601 note, officially declaring a "Cessation of Hostilities of World War II".

With respect to his first contention, plaintiff urges that his cause of action could not have accrued in 1943 at the time the loan was made, because at that time no fund had been created out of which payment could be made, and further, that it was contemplated by the parties that payment would be made only after the conquest of Japan and from a fund to be then set up by the proper United States authorities for that specific purpose. Plaintiff has attempted, by the making of certain allegations in his petition, to bring his case within the rulings of a number of cases in which the courts have held that a cause of action did not accrue, and therefore the statute of limitations did not commence to run, until the happening of certain specified events.

■ As stated by the Supreme Court in United States ex rel. Louisville Cement Co. v. Interstate Commerce Commission, 246 U.S. 638, 644, 38 S.Ct. 408, 410, 62 L.Ed. 914:

"* * * the time when a cause of action accrues had been settled by repeated decisions of this court to be when a suit may first be legally instituted upon it * * *."

None of the cases relied on by plaintiff departs from the above quoted rule, and although each of those cases holds that the particular cause of action did not accrue until the happening of some condition precedent, we do not believe that any of the holdings justify our deciding that plaintiff's cause of action accrued later than the date on which the loan was made.

■ In the first group of cases[2] relied on by plaintiff, the claims arose under statutes which provided that particular funds were to be created later out of which the claims would be paid, and the courts held that until the funds were created or a suffi-

---

1. Even deducting the entire period of hostilities in the Philippines up to the date of the formal surrender of the Japanese, the petition in the Tan case was filed more than six years from November 3, 1941.

2. King Iron Bridge & Mfg. Co. v. Otoe County, 124 U.S. 459, 8 S.Ct. 582, 31 L.Ed. 514; Lincoln County v. Luning,

133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766; Duke v. Turner, 204 U.S. 623, 27 S.Ct. 316, 51 L.Ed. 652; City of New Orleans v. Warner, 175 U.S. 120, 20 S.Ct. 44, 44 L.Ed. 96; Warner v. City of New Orleans, 167 U.S. 467, 17 S.Ct. 892, 42 L.Ed. 239; Robertson v. Blaine County, 9 Cir., 90 F. 63, 47 L.R.A. 459.

cient time had elapsed to reasonably allow for the creation of the funds, the causes of action did not accrue. In the instant case there was no statutory provision that a fund was to be established from which plaintiff's claim would be paid and no statement on the part of the guerrilla officer that such a fund would be established would have the effect of creating a condition precedent to the accrual of plaintiff's right to sue such as was present in the line of cases cited by plaintiff. While it is true that the Army Claims Service was set up to consider this type of claims and did consider and settle many of them, presentation of his claim to that Service and a decision thereon was not mandatory and was not a condition precedent to the accrual of plaintiff's right of action on the debt.

In another line of cases typified by the case of United States v. Taylor, 104 U.S. 216, 26 L.Ed. 721, the making of an application to a Government agency or department was the prerequisite to the accrual of a cause of action. In the Taylor case, the act under which the claim was asserted provided that surplus proceeds from the sale of land for taxes would be deposited in the Treasury and held for the use of the owner *until he should make application therefor,* and that upon such application he should be paid. The statute did not provide when the application had to be made by the owner, and when Taylor instituted his suit more than six years from the date of the tax sale, but not more than six years from the time he made application for the proceeds, the court held that his claim was timely because no right of action in his favor accrued until the application provided for in the statute had been made. We are unable to see any resemblance between Taylor's situation and that of plaintiff herein.

A third group of cases relates to claims by shippers for overcharges collected by carriers. Section 16 of the Act to Regulate Commerce, Act of June 29, 1906, 34 Stat. 584, 590, 49 U.S.C.A. § 16, provided that all complaints had to be filed within two years from the time the cause of action accrued. In United States ex rel. Louisville Cement Co. v. Interstate Commerce Commission, supra, the court referred to the well established rule that a cause of action first accrues when suit may first be legally instituted thereon, and held that until the unreasonable charges sued for were actually paid by the shipper to the carrier, the cause of action against the carrier had not accrued.

A fourth group of cases referred to by plaintiff relates to the provision of Revised Statutes, § 1059, now 28 U.S.C.A. §§ 1496, 2501, which gave the Court of Claims jurisdiction to give relief to Government disbursing officers from responsibility on account of loss of Government funds while the officer was on duty and for which the officer was held responsible.[3] In those cases the court held that until the proper Government accounting officer had denied the disbursing officer's claim, or refused to allow him a credit, or until there had been some authoritative demand on the disbursing officer for the payment of the money lost, no right of action in this court arose under the particular statute. Until the proper Government official had taken the action against the disbursing official whom the statute was intended to relieve, there was nothing that this court could do under the statute and no cause of action in favor of the disbursing official had accrued.

Finally, plaintiff refers to a line of cases[4] involving Government construction contracts where the contract itself provided that nothing should be due and payable under the contract until the contractor's work was completed and a final voucher for payment presented by the contractor to the Government. In those cases this court held that the cause of action in the contractor for payment under the contract does not accrue until the date of the event, action, or decision, agreed upon by the parties to the contract, at which time the right of action "has accrued in a shape to be effectually enforced." United States v. Wurts,

---

3. United States v. Clark, 96 U.S. 37, 24 L.Ed. 696; Scott v. United States, 18 Ct. Cl. 1; United States v. Smith, 105 U.S. 620, 26 L.Ed. 1191.

4. B-W Construction Company v. United States, 100 Ct.Cl. 227; Austin Engineering Co. v. United States, 88 Ct.Cl. 559.

303 U.S. 414, 58 S.Ct. 637, 639, 82 L.Ed. 932.

■ There is apparent in the present petition an attempt to bring the case within the doctrine of the last mentioned contract cases by the allegation that (paragraph 4 of the petition) "At the time of the furnishing of such money, plaintiff was told that he would be repaid by the appropriate American Army authorities at a later date." Assuming that the guerrilla officer who requisitioned or borrowed the funds from plaintiff had the authority to do so, we do not think that his promise of repayment by the Army "at a later date" is sufficiently definite to create the sort of condition precedent referred to in the cases cited by plaintiff, or to prevent plaintiff's cause of action from accruing at the time of the loan or requisition.

■ It is true that on August 6, 1945, General MacArthur, as commanding general, wrote to the Chief of Claims in the Philippines stating that the United States would assume the responsibility for paying certain claims arising out of activities of guerrilla forces in the Philippines, and that on January 3, 1947, a communication issued by Command of General MacArthur stated that the Army had authority to pay certain claims arising out of the activities of recognized guerrilla units by virtue of the First War Powers Act of 1941, 50 U.S.C.A. Appendix, § 601 et seq., and Executive Order 9001, 50 U.S.C.A.Appendix, § 611 note, and that such claims if allowed could be paid out of the appropriation for the expenses of the Army of the Philippines. However, as we pointed out in the Tan case, supra, claimants were not required to present their claims to the Army Claims Service, nor would their failure to do so have established a defense to their suits in court on such claims. The same situation exists in cases where claimants may submit claims for settlement to the General Accounting Office but pendency of a claim before that office does not suspend the running of the statute of limitations absent a statutory requirement that such procedure be followed.

■ After a careful consideration of all of plaintiff's arguments and authorities,

we can see no circumstance in this case which prevented the accrual of plaintiff's right of action immediately upon the delivery of his money to the guerrilla officer, and but for the existence of the hostilities, plaintiff might legally have instituted suit upon such claim at that time. Inasmuch as plaintiff's claim accrued during the wartime hostilities in the Philippines, the statute of limitations did not commence to run against the claim until plaintiff had access to this court, which date we held in the Marcos case to be September 2, 1945. Unless the present plaintiff was still denied access to the court on that date, his claim was barred by September 2, 1951, several months before his petition was filed.

In connection with the date of September 2, 1945 selected by the court in the Marcos case, plaintiff urges that hostilities in the Philippines cannot be said to have ceased with the formal surrender of the Japanese on that date, but only at the time of the Presidential Proclamation of December 31, 1946, supra. In holding that the statute of limitations commenced to run on September 2, 1945, we were not determining that all hostilities in the Philippines had ceased. We merely held that under all the circumstances of record in that case, it appeared that plaintiff had access to this court on and after September 2, 1945.

In a supplemental memorandum filed by plaintiff in further support of its contention that the statute of limitations was suspended with respect to the Philippines until the date of the President's proclamation on December 31, 1946, declaring hostilities with Japan to be at an end, our attention is called to several Civil War cases in which it was held that the statute was suspended until the dates of the President's proclamations declaring the war to have ended, and certain other cases in which the courts held that for purposes other than the statute of limitations, World War I continued until the signing of the treaty of peace.

In the Civil War cases, exemplified by The Protector, 12 Wall. 700, 20 L.Ed. 463 the court noted that the various acts of hostility occurred in parts of the country far removed from each other, at various periods of time and of different degrees of

importance so that it was very difficult to determine on what precise date the war began or ended. The President had issued two proclamations declaring the war closed, one in April 1866 for ten of the southern states, and one in August for Texas. In holding that the statute of limitations was suspended until those two dates, depending upon the state involved, the court stated:

"In the absence of more certain criteria, of equally general application, we must take the dates of these proclamations as ascertaining the commencement and the close of the war in the States mentioned in them." [12 Wall. at page 702, italics supplied].

If, in the Marcos case and the present case, there had been that same "absence of more certain criteria," the date of the presidential proclamation might well have furnished the only solution. However, as pointed out in the Marcos case, there are sufficient facts both of record and of which the court may take judicial notice to justify the holding that for most practical purposes the courts of the United States were open to Filipinos by September 2, 1945, more than a year prior to the President's proclamation that hostilities between the United States and Japan had ceased.

▋ In Hamilton v. Kentucky Distilleries & Warehouse Co., 251 U.S. 146, 40 S.Ct. 106, 111, 64 L.Ed. 194, the validity of the War Time Prohibition Act, 40 Stat. 1045, 1046, was challenged on the ground that there no longer existed a sufficient war emergency to justify its enforcement. In upholding the validity of wartime legislation the courts have gone far in finding the continued existence of war emergency after actual hostilities had ceased because, as noted by the Supreme Court in the Hamilton case:

" * * * every reasonable intendment must be made in favor of its continuing validity, * * * that to Congress in the exercise of its powers, not least the war power, upon which the very life of the nation depends, a wide latitude of discretion must be accorded; and that it would require a clear case to justify a court in declaring that such

an act, passed for such a purpose, had ceased to have force because the power of Congress no longer continued."

The court held that sufficient facts had been called to its attention, including the fact that no treaty of peace had been concluded, that the railways were still under national control by virtue of the war powers, and that other war activities had not been brought to a close, to justify the continued validity of the Prohibition Act. (Plaintiff's injunction suit was brought on October 10, 1919.) We doubt that the same factors which persuaded the Supreme Court that a sufficient war emergency still existed to validate the enforcement of wartime legislation would have been considered relevant on the issue of the lifting of the suspension of the statute of limitations had such issue been before the court.

In Kahn v. Anderson, 255 U.S. 1, 41 S.Ct. 224, 226, 65 L.Ed. 469, it was contended by the applicants for a writ of *habeas corpus* that the Court Martial had no power to try them for murder at the time of the trial which they contended was "in time of peace." In denying the application, the court pointed out that complete peace in the legal sense was not brought about by the Armistice and the cessation of hostilities, citing the Hamilton case, supra, and that when the Articles of War, 1916, used the term "in time of peace", peace in the complete sense, officially declared, was intended. The case did not involve the issue of the lifting of the suspension of the statute of limitations but rather the interpretation of a provision in the 1916 Articles of War.

In First National Bank of Pittsburgh v. Anglo-Oesterreichische Bank, 3 Cir., 37 F.2d 564, the court held that where the plaintiff was an alien enemy under the definitions of the Trading With the Enemy Act, 50 U.S.C.A.Appendix, § 1 et seq., the statute of limitations applicable to its claim against a United States national was suspended until treaty of peace was concluded between the United States and plaintiff's country because until that time plaintiff had the status of an enemy alien and the courts of the United States were closed to it.

We think the First National Bank case is clearly distinguishable from the instant

case. The Philippines was in no real sense an enemy country and a treaty of peace was never contemplated between the United States and the Philippines. During the period of Japanese occupation of the Islands, the Philippines was considered to be "enemy territory" because it was enemy occupied. During such occupation our courts were closed to Filipinos resident in the Islands on the theory that such persons were under the control of the enemy. Upon the surrender of the common enemy, the Japanese, and even prior thereto, many wartime restrictions on communications with the Philippines were lifted, and once organized enemy control of the Islands was deemed to have been substantially at an end, that country was no longer deemed to be "enemy territory" and there was no longer any need for imposing upon its citizens and residents the restrictions applicable to enemy nationals.

But plaintiff urges that because of certain General Rulings of the United States Treasury Department, Foreign Funds Control, freezing regulations imposed upon transactions in the Philippine Islands made it impossible for a Filipino to commence suit in this court since he could not send funds to the United States to pay his filing fee, nor transmit a power of attorney to counsel in the United States authorizing such a counsel to proceed to collect funds owing him by the United States, until August 31, 1946.

It is true that Treasury General Ruling 18 as promulgated May 25, 1945, required that such transactions as those mentioned above must be licensed and that requirement remained in effect until August 31, 1946. However, plaintiff has neither alleged nor shown that he could not have secured the necessary license on or after September 2, 1945, and nothing in the General Ruling itself or in the other documents called to our attention warrants our assuming that the procuring of such a license would have been impossible or even particularly difficult. Neither does plaintiff allege that he was, on September 2, 1945, resident in an unliberated portion of the Philippines.

Under all the circumstances we find no basis for modifying the conclusions reached in the Marcos and Tan decisions, and accordingly we hold that plaintiff's cause of action accrued at the time the loan was made, that the statute of limitations was suspended on his claim until September 2, 1945, and that his claim filed more than six years from that date is barred. Plaintiff's petition is dismissed.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER and LITTLETON, Judges, concur.