### Zeller's Lessee v. Jacob K. Eckert and others.

Under a will which devised land to the son of the testator, and provided that the
widow should continue in possession and occupation of the premises until the
son arrived at the age of fifteen years, she was entitled to their possession and
enjoyment until the time when the child would have reached the age of fifteen
if he had lived, although he died before that time.

Her possession, therefore, was not adverse to the heirs of the child, during that
period.

Where the original possession by the holder of land is in privity with the title of
the rightful owner, in order to enable such holder to avail himself of the statute
of limitations, nothing short of an open and explicit disavowal and disclaimer of
holding under that title, and assertion of title in himself brought home to the
other party, will satisfy the law.

The burden of proof is on the holder to establish such a change in the character of
the possession.

The statute does not begin to run until the possession becomes tortious and wrong-
ful by the disloyal acts of the tenant, which must be open, continued, and noto-
rious, so as to preclude all doubt as to the character of the holding, or the want of
knowledge on the part of the owners.

In this case there was evidence enough given upon this point to authorize the court
below to submit the question of adverse possession to the jury, and advise them
that a foundation was laid upon which they might presume a grant for the pur-
pose of quieting the title.

The whole charge of the judge to the jury is incorporated into this record. This
mode of making up the error books is exceedingly inconvenient and embarrassing
to the court, and is a departure from familiar and established practice.

So far as error is founded upon the bill of exceptions incorporated into the record,
it lies only to exceptions taken at the trial, and to the ruling of the law by the
judge, and to the admission or rejection of evidence. And only so much of the
evidence as may be necessary to present the legal questions thus raised and noted
should be carried into the bill of exceptions. All beyond serves to encumber
and confuse the record, and to perplex and embarrass both court and counsel.

The earlier forms under the statute giving the bill of exceptions are models which
it would be wise to consult and adhere to.

THIS was a writ of error to the Circuit Court of the United
States for the Eastern District of Pennsylvania, to bring up for
review certain instructions to the jury in an action of ejectment
brought by the plaintiff in error against the defendants in error, and
in which the latter obtained the verdict.

Frederick White was the owner of the premises in question,
being part of a small tract of land situate in the county of Lancas-
ter, Pennsylvania, of which he died seized in March, 1798, leaving
a last will and testament by which he devised the said land in fee to
Frederick White, Jr., his only child, who was then about four years
of age. He also provided in the will that his widow should con-

tinue in possession and occupation of the premises till the son arrived at the age of fifteen.

The widow married again in about nine months after the decease of her husband, Frederick White, to one George Eckert. One of the defendants, Jacob K. Eckert, is a son of that marriage, who was born in 1799. The other defendants claim under him.

Frederick White, Jr., the son, died in 1800, then about six years of age, leaving his mother and Jacob K. Eckert, the half-brother, surviving.

The mother resided upon the farm about one year, and then left the possession; but her husband had the charge of it, occupying and improving the land, leasing the same and receiving the rents and profits, till their son became of age, when he went into the possession and management, and he and those claiming under him have been in the possession and occupation of the same down to the present time. The farm has always been occupied, improved, and claimed as belonging to the half-brother, first by Eckert, the father, during his minority, and afterwards by the son (Jacob K.) himself, and those under him. Large and valuable improvements have been made while it was thus occupied.

Frederick White, the testator, was a native of Germany, and emigrated to this country as early as 1755, and soon after settled in Lancaster county, and purchased the premises in question, where he resided till his death, in 1798, being then about eighty years of age.

The lessors of the plaintiff claim to be the descendants of a half-sister, whom he left in Germany, and to be the heirs at law of Frederick White, Jr., the deceased son. Evidence was given on the trial tending to establish the heirship derivable from this source, and which constitutes their title to the premises.

It further appeared, that, as early as 1806, a family of the name of Bonert, another branch of the descendants of the half-sister, instituted action of ejectment against George Eckert, the father of the defendant, in the Common Pleas of Lancaster county, to recover the premises, as the heirs of the deceased son, Frederick White, Jr. This litigation appears to have been continued till 1810, when the controversy was referred to arbitrators, and an award made against the plaintiffs.

Another suit in ejectment was brought in the Circuit Court of the United States for the Eastern District of Pennsylvania, by the same plaintiff, which ended in a compromise between the parties, in 1818, by whom it was agreed that the property should be appraised, the plaintiffs to have one third, and Jacob K. Eckert, the half-brother, the remaining two thirds; and that they should cast lots in order to determine which of the parties should have the land, and pay the valuation according to their proportion. The land was appraised at the sum of $24,000; the plaintiffs got the

right to make their election, and they chose the land, by which they became obligated to pay to Eckert the sum of $ 16,000, in one year from the time the election was made. They failed to make the payment in pursuance of the agreement, and in 1823 a judgment was recovered against them for the amount, and interest, and all their right and title to the property was sold on execution, under the judgment, to Jacob K. Eckert, the half-brother.

It further appeared, that the lessors of the plaintiff in the present suit, called the Shultzheiss branch of the descendants of the half-sister, also brought suits against George Eckert, executor of the estate of Frederick White, the testator, to recover their share of the personal property, in the Common Pleas of Lancaster county, which in 1810 was referred to arbitrators, and an award made against them.

The latter were the only suits instituted by this branch of the heirs till the present suit was instituted to recover the real estate, which was commenced in April, 1834, and of course has been pending for nearly twelve years.

When the testimony closed, the counsel for the plaintiff prayed the court to instruct the jury, that, inasmuch as the widow of Frederick White was directed by his will to keep possession of the land until the son to whom it was devised should arrive at the age of fifteen, the possession by her and her husband was to be considered in the character of trustees of the estate for his benefit ; and after his death, for the benefit of those who might be entitled to the inheritance as heirs at law ; and that the possession, therefore, was not adverse to the plaintiff's title ; that the trust having once attached, the possession of Eckert and wife could not become adverse to the title of the *cestuis que trust.*

Which instruction the court refused, and charged the jury as follows : —

"That, however true it might be, in point of fact, that the widow and her husband did enter upon and continue the possession of the land as trustees for young White, or his heirs, up to any stated period, the legal consequences asserted by the plaintiff's counsel would not result. A trustee of any description may disavow and disclaim his trust, though it is in the utmost bad faith, or in violation of his express agreement, from which time his possession of lands, money, or chattels, held under an original trust, becomes adverse, so as to bar an action of account after six years, or an ejectment in twenty-one years after notice of the disavowal, disclaimer, and adverse possession is given to the person entitled to the benefit of the execution of the trust." "That notice of the disclaimer puts the true owner under the same obligation to reclaim the possession within the fixed period, as if no trust had ever existed ; and it matters not whether the trust began by the voluntary act of the trustee, or the law made him a trustee against his

will, as the result of his situation or conduct." And further, " That taking all the testimony in the cause in connection, the court thought the jury would be justified in finding that the possession of the defendants, from the death of young White, was adverse to the right and title of the plaintiff, and that George Eckert held it for his son; and that, should this be their opinion, the statute of limitations began to run against the right in 1809, and had its full effect in 1830, by a continued adverse possession of twenty-one years."

The court also instructed the jury that they were authorized, from the fact of the lessors of the plaintiff having made a claim to the estate of Frederick White, Sen., as early as 1806, and afterwards abandoning it till 1834, together with the other facts and circumstances in the case, to presume a grant to Jacob K. Eckert from the heirs.

To all which instructions the counsel for the plaintiff excepted, and a verdict was rendered for the defendants.

The cause was argued by *Mr. Charles J. Ingersoll*, for the plaintiff in error, and *Mr. Scott*, for defendants.

*Mr. Ingersoll*, for the plaintiff in error, said that the opinion of the Circuit Court was, that the plaintiff was barred by limitation. But the widow was directed by the will to hold the property for the child, and both she and her husband were trustees for the child and his heirs. The trust once existed, — that is certain. But the court say that a trustee may disavow his trust, and establish his own right, " though it is in the utmost bad faith, or in violation of his express agreement." It is very true that a trustee may disavow his trust, and give notice that he means to hold the property in his own right; and in such case the other party is required to take care of himself. But the law will not sanction bad faith. In the charge of the court, it is said, also, that the effect of the record and writings introduced in evidence was for the court to decide; but the question was a mixed one of law and fact. 7 Wheat. 535 ; 5 Peters, 438, 440, 491, 493 ; 11 Peters, 51 ; 6 Peters, 743 ; 3 Peters, 48 ; 4 Peters, 500 ; 10 Peters, 221, 226.

These cases do not sustain the doctrine stated by the Circuit Court, namely, that " a trustee of any description may disavow and disclaim his trust, though it is in the utmost bad faith, or in violation of his express agreement ; from which time his possession of lands, money, or chattels, held under an original trust, becomes adverse, so as to bar an action of account after six years, or an ejectment in twenty-one, after notice of the disavowal, disclaimer, and adverse possession is given to the person entitled to the benefit of the execution of the trust."

The case in 2 Sch. and Lefr. 628, 636, is stronger, it must be admitted, in favor of the doctrine, but the case in 14 Serg. &

Rawle, 570, does not bear out the Circuit Court. See 1 Binney, 575, and also 14 Serg. & Rawle, 333.

The Pennsylvania cases all look to the fairness of the transaction, but here the court say that it was natural for the party holding to believe that the property belonged to him, and that these German heirs must have known that the trustee was claiming it in his own right.

*Mr. Scott,* for defendants.

There is no bill of exceptions in the record. It ought to be signed and sealed, and this court cannot notice an exception which does not come up in that way. 3 Peters, 418 ; 4 Peters, 104 ; 3 Wheat. 651.

The charge of the judge below has been misunderstood. He inculcates no immoral principles. It was necessary for the jury to find the intention of the party, for it is one of the elements of adverse possession. If it is natural for a father to consider himself as holding property for his son, then this natural feeling is one of the evidences of intention, and it was not wrong in the judge to indicate to the jury all the sources from which they would be enabled to find the intention.

The intention is important. 5 Peters, 438, 440, 500.

The judge in his charge refers to the escheat laws of Pennsylvania, by which the estate would have gone to the half-brother for the want of other heirs of young White, with the unsettled state of the laws of descent for more than thirty years afterwards, and says, it " is a powerful consideration in our minds to denote a contrary intention." See Purdon's Digest, 384, or 2 Dallas, 552, or 2 Smith, 425 ; 3 Yeates, 400.

So the law stood until overruled by 7 Serg. & Rawle, 397, in 1831. Was it a fault or crime in a father to hold for his son, under this state of the law, or in a judge to say so ?

Statutes of limitations are to be enforced by courts, and disabilities, in order to exonerate a party from their operation, are not to be heaped one upon another. 7 Serg. & Rawle, 209 ; 1 Watts, 341.

It has been said, that the judge argued the case too much. But this court has nothing to do with the comments of the court below upon evidence ; its only province is to correct mistakes in law. 4 Peters, 1 ; 3 Howard, 205.

The charge expressly says, that the jury are to decide, without being bound by the opinion of the court.

It is also said, that the claim, having been made within eighteen years, will prevent the statute from running. The statute of Pennsylvania requires the suit to be brought within twenty-one years, and a suit upon some collateral matter is not sufficient. If there is no such exception in the statute, the court can make none.

Y *

The very fact of litigation shows the possession to have been adverse. 3 Howard, 674.

The statute of limitations is found in 2 Dallas, 281, or 2 Smith, 299.

There are no exceptions on the record of this case, and no instructions asked. White died in 1798, and directed his widow to keep possession, but not for his son, as is said by the other side. The will is not in the record, and is only found in the charge of the judge. But it is stated in 1 Binney, 576. The widow's fifteen years were out in 1809. She married again in 1798, and the defendants sold and leased the property. In 1809, some claimants appeared and brought suits, which were compromised. The language of the judge which is complained of contains the doctrine of this court. 7 Wheat. 535, 549; 3 Peters, 48, 52; 4 Peters, 500; 5 Peters, 438, 440, 491–493; 10 Peters, 221, 226.

See also Preston on Abstracts, 376; 1 Watts, 275; 7 Johns. Ch. Rep. 100; 3 Howard, 411; 1 Howard, 189.

*Mr. Ingersoll,* in reply.

The agreement of counsel which is found in the record removes all difficulty which might arise from there being no bill of exceptions signed and sealed. The reason why such an agreement was made is, that there were two ejectments pending, in one of which there was a long trial, and the court gave the charge which is in the record. In the second case it was thought unnecessary to have another charge, and we agreed to bring the case up, adopting the charge in the first case. The case comes up somewhat irregularly, but Judge Sergeant has said that short pleadings are sanctioned by the bill of rights.

There is only one main point in the case, which is, whether or not there was an implied trust in the property. How far trusts are within the statutes of limitation, see 2 Preston on Abstracts, 375; 7 Johns. Ch. R. 90.

We do not deny that a trustee can repudiate the title of his *cestui que* use, but we say that such repudiation must be distinct and explicit. And as the widow was directed, by her first husband's will, to hold the premises for the first son till fifteen years of age, she and her second husband, Eckert, held as trustees, and no adverse possession took place. During the first six years, as long as the first son lived, it clearly was a trust, and this trust was never disowned. The charge of the court below included the discussion of this fact of adverse possession, and thus excluded the jury from the consideration of what belonged to them alone. We say, therefore, that there was error.

Mr. Justice NELSON delivered the opinion of the court.

According to the true construction of the will of Frederick

White, we are inclined to think that the widow was entitled to the possession and enjoyment of the premises in question down to the year 1809, when the son would have arrived at the age of fifteen had he survived, notwithstanding his death in 1800, some nine years short of that time, as the testator probably intended the rents and profits during this period as a part of her provision in the settlement of his estate. The right of entry, therefore, did not accrue to the lessors of the plaintiff till that time. Then the widow and her husband were bound to surrender the possession to the son had he lived, and of consequence to his heirs at law in the event of his death.

The statute of limitations attached and began to run from this period, provided the evidence is sufficient to raise an adverse possession on the part of the defendants, in hostility to the title of the heirs.

This suit was commenced in April, 1834, some twenty-five years from the time the right of entry accrued. The statute of limitations in the State of Pennsylvania is twenty-one years.

The original possession of Eckert, the husband of the widow, being confessedly in subordination to the title of the younger White during his lifetime, and after his decease to the title of the heirs at law, down to 1809, when the right to occupy under the will ceased, the burden lay upon him to establish a change in the character of the possession after this period ; and being thus in privity with the title of the rightful owner, nothing short of an open and explicit disavowal and disclaimer of a holding under that title, and assertion of title in himself, or in his son, the half-brother, brought home to the lessors of the plaintiff, will satisfy the law. Short of this, he will still be regarded as holding in subserviency to the rightful title. There are authorities maintaining the doctrine, that a party standing in the relation of Eckert to the title in question is incapable in law of imparting, by any act of his own, an adverse character to his possession ; and that, in order to deny or dispute the title, he must first surrender the possession, and place the owner in the condition he stood before the possession was taken under him. This doctrine was supposed to govern the rights of trustee and *cestui que trust*, landlord and tenant, vendor and vendee, tenants in common, &c., and that no lapse of time would lay a foundation for a statute bar to the right of entry by reason of an adverse possession between parties standing in this relation, or any others in like privity.

The law, however, has been settled otherwise. The trustee may disavow and disclaim his trust ; the tenant, the title of his landlord after the expiration of his lease ; the vendee, the title of his vendor after breach of the contract ; and the tenant in common, the title of his cotenant ; and drive the respective owners and claimants to their action within the period of the statute of limita-

tions. 2 Bos. & Pul. 542.; 5 Barn. & Ald. 232 ; Cowp. 217 ; 2 Stark. Ev. 887 ; 7 Johns. Ch. R. 90 ; 20 Johns. R. 565 ; 4 Serg. & Rawle, 310 ; 7 Wheat. 548 ; 3 Peters, 52, C. & H.'s note, Pt. 1, notes, 307, 311, and cases ; 2 Sch. & Lefr. 633 ; 2 Jac. & Walk. 1, 191.

The only distinction between this class of cases and those in which no privity between the parties existed when the possession commenced is in the degree of proof required to establish the adverse character of the possession. As that was originally taken and held in subserviency to the title of the real owner, a clear, positive, and continued disclaimer and disavowal of the title, and assertion of an adverse right, and to be brought home to the party, are indispensable before any foundation can be laid for the operation of the statute. Otherwise, the grossest injustice might be practised ; for, without such notice, he might well rely upon the fiduciary relations under which the possession was originally taken and held, and upon the subordinate character of the possession as the legal result of those relations.

The statute, therefore, does not begin to operate until the possession, before consistent with the title of the real owner, becomes tortious and wrongful by the disloyal acts of the tenant, which must be open, continued, and notorious, so as to preclude all doubt as to the character of the holding, or the want of knowledge on the part of the owner. If he then neglects to enforce his rights by action within the period fixed by the statute, the loss, as in every other case of the kind, is attributable to his own laches, and not to the law.

The main question, therefore, here is, as to the sufficiency of the proof. It appears, that as early as 1809 the heirs claiming here instituted actions against Eckert, as executor of Frederick White, the testator, to recover their share of the personal estate, as next of kin to the younger White, which were resisted, on the ground the whole estate belonged to the half-brother, and the claim defeated. Another branch of the same family, at an earlier date (1806), instituted actions of ejectment to recover their share of the real estate, which were resisted upon like ground, and like result. Both branches of the litigation were brought to a close in 1810. The latter branch (not the parties here) again renewed the litigation to recover the realty in 1816, which terminated in 1818 by compromise, with a view to put an end to the controversy, but which fell through by reason of the failure of the plaintiffs to fulfil the conditions of the settlement.

The present is the first suit brought by this branch of the heirs to recover the real estate, and which was commenced after the lapse of twenty-five years from the time their right of entry accrued, and after the lapse of the same period, also, from the termination of a litigation on behalf of themselves and their co-heirs

to recover the estate, real and personal, in which the present defendant succeeded. During all this time their title has been disavowed and resisted, and the right and title of the half-brother of the younger White asserted and maintained ; and the property occupied, cultivated, and improved under this claim of title and ownership ; and portions of it are now in possession of *bonâ fide* purchasers, upon which large and valuable erections and improvements have been made.

We are satisfied, therefore, that the court below were right in submitting the question of adverse possession to the jury ; as there was evidence enough, even within the strictest rules of law on this subject, arising out of the fiduciary relation in which the defendant originally stood to the title, to make this the duty of the court. And, further, looking at all the facts and circumstances disclosed at the trial, and characterizing the possession, occupation, and improvement of the property, we cannot say that any error was committed in also advising the jury that a foundation was laid upon which they might presume a grant for the purpose of quieting the title.

Twenty years' possession by one of two tenants in common, accompanied with an exclusive appropriation of the rents and profits, acquiesced in by the cotenant, has been held to afford the presumption of a conveyance from the party out of the possession (Cowp. 217), and the same length of time, coupled with other circumstances, a conveyance or release of an equity of redemption to the mortgagee in possession (9 Wheat. 490, 497, 498).

The facts and circumstances in this case, in connection with the length of the possession and occupation, are much stronger in favor of allowing the presumption, than existed in several cases where the doctrine has been applied.

The charge of the court below is a most elaborate one, discussing at large both the law and the facts upon general principles and upon authorities, as well as in reference to the particular questions involved, and the whole incorporated into the record. Some of the comments, both upon the law and the facts, are justly liable to the criticisms made by the learned counsel on the argument. But, looking at the whole case, and the main grounds upon which it was placed before the jury, we cannot say that the appellate court should interfere, or that the parts obnoxious to the criticisms afford ground of review and reversal on a writ of error.

This mode of making up the error books is exceedingly inconvenient and embarrassing to the court, and is a departure from familiar and established practice.

So far as error is founded upon the bill of exceptions incorporated into the record, it lies only to exceptions taken at the trial to the ruling of the law by the judge, and to the admission or rejection of evidence. (1 Bac. Abr. 779 ; Bull. N. P. 316.) Beyond this

we have no power to look into the bill, on a writ of error, as it is the creature of statute, and restricted to the points stated.    13 Edw. 1, c. 31.    And only so much of the evidence given on the trial as may be necessary to present the legal questions thus raised and noted should be carried into the bill of exceptions.    All beyond serves only to encumber and confuse the record, and to perplex and embarrass both court and counsel.

We have no concern, on a writ of error, with questions of fact, or whether the finding of the jury accords with the weight of the evidence.    The law has provided another remedy for errors of this description, namely, a motion in the court below for a new trial, on a case made.    More attention to the practice in drawing up the bill of exceptions, and to method and order in making up the error books, would greatly relieve the court, and enable counsel to bring out more readily and distinctly for consideration the legal questions involved.    The earlier forms under the statute giving the bill of exceptions are models which it would be wise to consult and adhere to.

We think the judgment in the Circuit Court should be affirmed.