EDDY v. CITY AND COUNTY OF SAN FRANCISCO.

(Circuit Court, D. California. August 24, 1906.)

No. 13,697.

MUNICIPAL CORPORATIONS—SUIT TO ENFORCE BONDS PAYABLE FROM SPECIAL FUND—LACHES.

An act of the Legislature of California (St. 1875–76, p. 433, c. 326), authorized the board of supervisors of the city and county of San Francisco in its discretion to pass an order for the widening of Dupont street, which order might be rendered nugatory, however, by the action of a majority of the abutting property owners. In case it remained effective, the act created a commission to have charge of the improvement and prescribed the procedure. It provided that all damages, costs, and expenses of the improvement should be paid by bonds of "the city and county of San Francisco," due and payable in 20 years, which should be paid, principal and interest, from taxes to be levied upon the lands found to be benefited, and for which the municipality should not be liable. It further provided that a tax sufficient to pay the interest and one-twentieth of the principal of such bonds should be annually assessed, levied, and collected "in the same manner as other taxes." Held, that the municipality was not a voluntary or contractual trustee with respect to the levy and collection of such taxes, but that the duty was one imposed by the statute upon certain of its officers, for a breach of which it could not be charged with liability as a trustee, and that where such duty was not performed except for five years after the issuance of the bonds, a bondholder who waited until more than 20 years there-

after, and 8 years after the maturity of the bonds, was barred by laches from maintaining a suit for equitable relief against the municipality.

In Equity. On demurrer to bill.

W. T. Hume and John H. Dickinson, for complainant.

Napthaly, Friedenrich & Ackerman, for defendant.

MORROW, Circuit Judge. This is a bill in equity filed in this court on January 4, 1905, by the complainant, a citizen of the state of Rhode Island against the defendant, the city and county of San Francisco, to enforce an alleged trust arising out of the proceedings connected with the widening of Dupont street between Bush street and Market street in the city of San Francisco, in the year 1877. The act of the Legislature of the state, approved March 23, 1876 (St. Cal. 1875–76, p. 433, c. 326), entitled "An act to authorize the widening of Dupont street in the city of San Francisco," provided for proceedings that would extend Dupont street to a uniform width of 74 feet, from the northerly line of Market street to Bush street, and from Bush street to the southerly line of Filbert street.

Section 21 (page 442) of the act authorized the board of supervisors of the city and county of San Francisco, if in the judgment of the board it should be expedient that Dupont street be widened in accordance with the mode prescribed by the act, to express such judgment by resolution or order, within 60 days after the passage of the act, and in the event the board should fail to pass or adopt such order or resolution, then no further proceedings should be had or taken under the act for any purpose whatever; but if the board should pass such resolution, then all proceedings thereafter should be taken under the provisions of the act. The board passed such resolution within the time prescribed, and further proceedings were taken in accordance with the act.

The fourth section (page 434) of the act constituted the mayor, the auditor and the surveyor of the city and county of San Francisco, and their successors in office, a board of Dupont street commissioners to perform the duties prescribed in the act. They were each to receive a compensation of $2,000 for their services. In the event the board of supervisors, under section 21, passed the resolution expressing their judgment in favor of the improvement, then, under section 6, the board of Dupont street commissioners were to publish notice in two of the daily papers printed in San Francisco, informing property owners along the line of the street of the organization of the board, "and inviting all persons interested in property sought to be taken, or which would be injured by said widening, to present to the board maps and plans of their respective lots, and a written statement of the nature of their claim or interest in such lots."

The second section provided that the value of the land taken for the widening of the street and the damages to improvements thereon or adjacent thereto, which might be injured thereby, and all expenses whatsoever incident to such widening, should be held to be the cost of widening said street, and should be assessed upon the district there-

148 F.—18

in described as benefited by said widening, in the manner therein provided. The district declared to be benefited by the proposed improvement, and upon which the cost of making the assessment was to be assessed, was described and designated in section 3 of the act, and included two strips between Filbert and Market streets; one on the east side of Dupont street, extending in width half way to Kearny street, and the other on the west side of Dupont street, extending in width half way to Stockton street. Kearny and Stockton streets are adjoining streets, on the east and west side, respectively, of Dupont street, and running parallel to that street. It was further provided in section 3, that in case Dupont street were not widened further north than Bush street, then the district to be benefited should be bounded on the north by the southerly line of Bush street, and on the south by the northerly line of Market street.

In section 12 (page 438), it was provided that the majority of the property owners on Dupont street between Market street and Bush street might defeat the improvement and relieve themselves from any burden on account of it by filing a written protest at any time within 30 days after the notice in section 6 of the act had been given. No such protest was filed. Section 12 also provided that unless within that time the majority of the property owners fronting on Dupont street between Bush and Filbert streets should petition for it, there should be no widening north of Bush street, but that portion of the assessment district should be exempt and excluded from the operation of the act. No such petition was filed and the widening of Dupont street was accordingly limited by the property owners in the district to the four blocks between Market and Bush streets. In the event the improvement should be authorized, first, by the resolution of the board of supervisors, as provided in section 21, and, second, by the action of the property owners under section 12, the board was then required by section 7 (page 435) to proceed to ascertain and determine and separately state and set down in a written report, the description and actual cash value of the several lots and subdivisions of lands and buildings included in the land taken for the widening of Dupont street, and the damages done to the property along the line of said street, and the board was also required to proceed and ascertain and set down, in a written report, a description of the several lots of land included in the district to be benefited by the widening of said street, and the sum or amount in which, according to the judgment of the board, the said lot would be benefited by the improvement. It was further provided that when such report was completed, it was to be left at the office of the board daily, during the ordinary business hours, for 30 days, for the free inspection of all parties interested, and notice that the same was open for such time at such place was to be published by the board daily for 20 days in two daily papers printed and published in the city. At any time within this 30 days, any person interested, who felt aggrieved by the action of the board, could file in the county court his petition setting forth his grievance, and the court was empowered to cause the same to be altered or modified, and finally approved as modified.

It was provided in section 9 (page 436) that all damages, costs, and expenses arising from or incidental to the widening of the street being fixed by the confirmation of the report, as in the act provided, the board was to issue bonds of the city and county of San Francisco in such forms as they might prescribe, in sums of not less than $1,000 each, for such an amount as would be necessary to pay and discharge all such damages, costs, and expenses. The bonds were to be known and designated as the "Dupont Street Bonds," and were to be payable within 20 years from their date, unless sooner redeemed as in the act provided. They were to bear interest at 7 per cent. per annum, payable semiannually; such interest being evidenced by coupons attached to each bond, and signed by the president of the board.

In section 10 (page 437) it was provided that any person or persons to whom damages were awarded, according to the provisions of the act, upon tendering to the board a satisfactory deed of conveyance to the city and county for the land for which damages were so awarded, was entitled to have bonds in an amount equal to the damages awarded for the lands conveyed, together with damages for the improvements thereon or affected thereby, and the bonds so issued and delivered were to be in full compensation for all damages for lands and improvements taken and improvements injured, as contemplated in the act.

By section 11 the board was authorized to sell bonds sufficient to realize money enough to meet and discharge all expenses and damages arising from the widening of the street as established by the report as finally confirmed. The money arising from the sale was to be known and designated as the "Dupont Street Fund." As soon as the bonds were converted into money, as in the act provided, the board of commissioners was required to give public notice in the daily newspapers published in the city and county, for at least 10 days, that they were prepared to pay all damages and liabilities fixed by the final report of the board (not then already discharged) and upon receiving from the parties entitled thereto the proper deeds or proper acquittances from those entitled to compensation, the board was to give to each party an order upon the treasurer for the amount shown to be due, according to the report, payable out of the Dupont street fund.

Provision was made, in section 13 (page 439) of the act, for the levy, assessment, and collection, annually, at the same time and in the same manner as other taxes are levied in the city and county, of taxes upon the lands affected, sufficient to pay the interest on the bonds as they matured, and also sufficient to pay one-twentieth of the principal, and to constitute a sinking fund for the redemption of the bonds; such taxes to be collected out of such lands only, and to be adjusted and distributed according to the values as fixed in the final report of the board, and to go into the hands of the treasurer of the city and county as part of the Dupont street fund.

Section 22 (page 443) of the act provided that the completion of the work should be deemed an absolute acceptance by the owners of all lands affected by the act, and by their successors in interest, of the lien created by it upon the several lots so affected, and operated as an

absolute waiver of all claims in the future upon the city and county of San Francisco and their successors in interest, for any part of the debt created by the bonds authorized to be issued. It was further provided that this provision of the statute should be regarded as a contract between the owners and holders of the bonds and said city and county, and that this provision should be stated on the face of the bonds.

It appears that pursuant to section 9 of the act the board of commissioners reported to the county court the amount of damages allowed, and the value of the real estate taken, and the damages imposed thereon, and the actual contingent expenses incurred or that might be incurred, and reported that the total amount of such damages and costs would be $898,105; that the county court modified said report as to the value of the real estate taken, and decreased the same $84,422, reducing the total cost of damages to the sum of $813,683. The board of commissioners thereupon issued bonds to the extent of $1,000,000. The bonds contained the agreement on the part of the bond holder waiving all claim against the city and county of San Francisco, provided in section 22 of the act. The complainant claims to be the owner of 10 of these bonds of $1,000 each, dated January 1, 1877, payable 20 years from date, with interest at 7 per cent. per annum.

The complaint alleges:

"That the defendant and its officers, failed and neglected to levy and collect taxes, or in any manner provide sufficient money, or create a trust fund, as provided in said act, sufficient in amount to pay the interest on the full amount of said bonds, as the same accrued, or to redeem the bonds so issued and disposed of by defendant, and that the amount collected for the payment thereof, as required by the provisions of said act, was sufficient to pay only a part thereof, and that by reason thereof no funds have come into the hands of said defendant, or the treasurer thereof, or are now in their possession, or under their control, under the provisions of said act or otherwise, sufficient to meet the said interest or the said bonds, or to meet any part of the sum due thereon to this plaintiff. * * * That plaintiff has demanded payment of said bond and the interest coupons attached thereto, from the city and county of San Francisco, and from the treasurer thereof; but, notwithstanding the said demand of the plaintiff, and notwithstanding that the said bond and the interest coupons, are long past due and payable, the same has not been paid or redeemed as by said act provided, or any part thereof, or in any manner, except the coupons thereon from No. 1 to No. 4, inclusive, and the said bond and the said coupons from No. 5 to No. 40, both inclusive, still remain, and are wholly unpaid and unredeemed, and due and owing to this plaintiff. * * * That the said defendant accepted said trust and entered upon the performance of its duties thereunder, but did not keep and perform the conditions and obligations of said trust, and has abandoned the same without notice of any kind to the plaintiff, nor did it perform the duties and obligations imposed upon it as trustee as defined in said act. On the contrary defendant, the said city and county of San Francisco, failed and neglected, during the time specified in said act, or at any time, to assess, levy, and collect, or cause to be assessed, levied and collected from the property specified in said act, or otherwise, taxes sufficient to pay the interest coupons and to redeem the said bonds, as provided therein, and failed in any manner to create the trust fund provided for therein in such sum as to pay the said bonds and coupons, or to provide in any manner for their payment."

The relief prayed for is for an accounting by the defendant for the various sums of money collected by it as taxes and otherwise under the provisions of the act of the Legislature, and for a judgment in favor of the complainant for the principal and interest on complainant's bonds, and for an order and decree requiring and directing defendant to immediately proceed to carry out the alleged trust by proceeding to levy and collect in the proper manner, and as provided by the act of the Legislature, a sum of money sufficient to pay the said complainant the amount found to be due her, together with her costs. To this complaint the defendant has demurred on the ground that the complainant is not entitled to the relief prayed for, and for want of equity in the bill; that complainant's remedy is barred by lapse of time and by the laches of complainant; that there is a want of proper parties defendant, and that the bill is uncertain.

The case of Mather v. City and County of San Francisco, 115 Fed. 37, 52 C. C. A. 631, was an action at law in this court on a number of these bonds, to establish by judgment the amount due the plaintiff for the purpose of securing by way of execution a writ of mandamus to compel the collection of the tax necessary to pay the amount of the bonds and interest. The complaint was demurred to on a number of grounds, which were sustained and the complaint dismissed; judgment being entered for the defendant for costs. The case was taken to the Circuit Court of Appeals upon a writ of error. With respect to the liability of the city and county of San Francisco on these bonds, the court said:

"The provision in the act of the Legislature that the city and county of San Francisco shall not be liable for the debt created by the bonds does not absolve it from responsibility to provide the means for the payment of the bonds in the manner prescribed by the act. * * * The provision in the act exempting the city and county of San Francisco from liability for the debt means only that the debt is not the debt of the city and county, and is not enforceable against it as such. It does not mean that the city and county has received legislative authority to refrain from doing the very things which the act of the Legislature commanded it to do. The Legislature certainly did not intend that the bondholders should have no remedy on their bonds. * * * The means provided by the Legislature for the payment of these bonds is plainly pointed out in the statute. Assuming, as we must, upon the demurrer, that the averments of the bill are true, it is clear that the defendant in error has been remiss in the performance of its duty. The bonds have not been paid for the reason that the fund for the payment thereof has not been created as the law required that it should be created. The present suit has no other aim than to compel the defendant in error to do what it ought to do, and what the act required it to do."

But the court also held that the statute of limitations of California (Code Civ. Proc. § 337), requiring that an action upon a contract or liability founded upon an instrument in writing executed in this state should be brought within four years was applicable to an action on interest coupons attached to municipal bonds and barred the action in four years from the time the coupons matured. The action was commenced June 22, 1900, and the court held that the statute operated to bar the action on all the coupons save the last two, namely,

those due on July 1, 1896, and January 1, 1897. The present action was not commenced until January 4, 1905. To avoid the statute of limitations or the corresponding defense in equity that complainant's remedy is barred by lapse of time and by the laches of the complainant, the bill charges the defendant as a voluntary trustee in whose favor the right to interpose such defense does not begin to run until there is a distinct repudiation of the trust. The complainant cites Warner v. New Orleans, 167 U. S. 467, 17 Sup. Ct. 892, 42 L. Ed. 239, and New Orleans v. Warner, 175 U. S. 120, 20 Sup. Ct. 44, 44 L. Ed. 96, as supporting the cause of action alleged in the bill. The two cases relate to the same transaction. In 1858 the state of Louisiana undertook the work of draining and reclaiming portions of the parishes of Orleans and Jefferson. This work was to be done under the direction and control of the board of drainage commissioners appointed for the several districts into which the territory was divided. Provision was made for assessing the cost and expenses of the work upon the property benefited. The work continued under these auspices until 1871, when, by an act of the Legislature, the board of drainage commissioners was abolished and the work of drainage transferred to a canal company, but the duty of collecting the assessments was imposed upon the board of administrators of the city of New Orleans, and the administrator of accounts was directed to draw warrants on the administrator of finance against the drainage fund for the payment of amounts due for the work. The canal company, becoming embarrassed, assigned all its rights to an individual, who completed about two-thirds of the work prior to February 24, 1876, when an act was passed authorizing the city of New Orleans to assume exclusive control of the drainage work, and, if it desired, to purchase from the canal company and its transferee all the boats, tools, and apparatus pertaining to the work, and also the franchise of the company. This act further provided that the price should be paid by the city with drainage warrants in the same form and manner as those theretofore issued. The city elected to make the purchase of the property of the canal company and its transferee. It was appraised at $300,000, and a formal sale and transfer was executed by the company and its transferee to the city at the amount named, payable in drainage warrants, and the city covenanted "not to obstruct or impede, but, on the contrary, to facilitate, by all lawful means, the collection of drainage assessments, as provided by law, until said warrants have been fully paid; it being well understood and agreed by and between said parties thereto that collection of drainage tax assessments should not be diverted from the liquidation of said warrants and expenses under any pretext whatsoever until the full and final payment of the same."

It appears that prior to the purchase of the property from the canal company and its transferee, the city had issued its bonds in excess of the whole amount assessed against individuals and against the city on the areas of its streets and squares. After the city had assumed exclusive control of the work, after it had voluntarily purchased from the canal company and its transferee their property,

and had given its warrants payable out of the drainage fund, it sold some of the drainage machinery, suffered the rest to become rotten and valueless, and abandoned the work of drainage, so that by reason of the noncompletion of the drainage system drainage taxes could not be collected, inasmuch as no benefit had been conferred upon the property. Further than this, the city, by various means, impeded the collection of the taxes, and by conduct, ordinance, and proclamations encouraged and induced the people to refuse to pay the assessments, whereby those due by private persons became valueless. The Supreme Court of the United States, in Warner v. New Orleans, 167 U. S. 467, 477, 17 Sup. Ct. 892, 42 L. Ed. 239, answering questions certified by the Circuit Court of Appeals, stated that the question was whether the city was not estopped to plead in defense of liability on these drainage warrants the fact of a prior issue of bonds to a greater amount than that assessed by areas against the streets and squares and collected from private property. The court thought the question must be answered in the affirmative, on the ground that the city, in respect to the purchase of the property from the canal company and its transferee, and in the obligations assumed by the warrants issued, had acted voluntarily. It was, in this transaction, a voluntary contractor and the proposition which the court affirmed was:

"That one who purchases property, contracting to pay for it out of a particular fund, and issues warrants therefor payable out of that fund—a fund yet partially to be created and created by the performance by him of a statutory duty—cannot deliberately abandon that duty, take active steps to prevent the further creation of the fund, and then, there being nothing in the fund, plead in defense to a liability on the warrants drawn on that fund that it had prior to the purchase paid off obligations theretofore created against the fund. Whatever equity may do in setting off against all warrants drawn before this purchase from the canal company and its transferee the bonds issued by the city, * * * it by no means follows that the city can draw new warrants on the fund in payment for property which it voluntarily purchases, and then abandon the work by which alone the fund could be made good, resort to means within its power to prevent any payments of assessments into that fund, and thus, after violating its contract promise not to obstruct or impede, but on the contrary to facilitate by all lawful means, the collection of the assessments, plead its prior issue of bonds as a reason for evading any liability upon the warrants. One who purchases property and pays for it in warrants drawn upon a particular fund, the creation of which depends largely on his own action, is under an implied obligation to do whatever is reasonable and fair to make that fund good. He cannot certainly so act as to prevent the fund being made good, and then say to his vendor, you must look to the fund and not to me."

In New Orleans v. Warner, 175 U. S. 120, 20 Sup. Ct. 44, 44 L. Ed. 96, the same case had reached the Supreme Court on appeal, and in deciding the case the court again referred to the facts, reaffirmed what it had said in the previous case in answer to the questions propounded by the Circuit Court of Appeals, and added:

"Having thus voluntarily assumed the obligations of a trustee with respect to this fund, it cannot now set up the statute of limitations against an obligation, which, as such trustee, it had undertaken and failed to perform. The rule is well settled that in actions by cestuis que trust against an express trustee the statute of limitations has no application, and no length of time is a bar. While that relation continues, and until a distinct re-

pudiation of the trust by the trustee, the possession of one is the possession of the other, and there is no adverse relation between them. Perry on Trusts, § 863. In Oliver v. Piatt, 3 How. 333, 411, 11 L. Ed. 622, it is said that 'the mere lapse of time constitutes of itself no bar to the enforcement of a subsisting trust; and time begins to run against a trust only from the time when it is openly disavowed by the trustee who insists upon an adverse right and interest, which is fully and unequivocally made known to the cestui que trust.' To set the statute in motion the relation of the parties must be hostile, and so long as their interests are common, or their relations fiduciary, as in the case of landlord and tenant, guardian and ward, vendor and vendee, tenants in common, or trustee and cestuis que trust, the statute does not begin to run. Zeller's Lessee v. Eckert, 4 How. 289, 11 L. Ed. 979; Seymour v. Freer, 8 Wall. 202, 19 L. Ed. 306; Lewis v. Hawkins, 23 Wall. 119, 23 L. Ed. 113."

Is the doctrine of this case applicable to the case now before the court? The city and county of San Francisco was not a volunteer contractor nor a volunteer trustee. What it did it did pursuant to the statute and under its express direction. The only discretion it exercised was to give its consent through the board of supervisors to the widening of Dupont street, but it was still left to the majority of the owners of property affected by the proposed improvement to protest against it and the project would be defeated. Nothing that the city was required to do could prevent such action if the property owners deemed the improvement adverse to their interests. The only contract the city entered into was with the bondholders, and even this contract was expressly directed by section 22 of the act. That section is as follows:

"The completion of the work described in this act shall be deemed an absolute acceptance by the owners of all lands affected by this act, and by their successors in interest, of the lien created by this act, upon the several lots so affected, and it shall operate as an absolute waiver of all claim in the future upon the city and county of San Francisco for any part of the debt created by the bonds authorized to be issued by this act, and their successors in interest. This shall be regarded as a contract between said owners and the holders of said bonds and said city and county, and this provision shall be stated on the face of the bonds."

What the defendant failed and neglected to do, as charged in the bill of complaint, was to fail and neglect to assess, levy, and collect sufficient taxes upon the property described in the act for the purpose of creating a fund to be held in trust for the payment of the interest and the full amount of the bonds issued and disposed of by the defendant, and it is alleged that by reason thereof no funds had come into the hands of the defendant or the treasurer thereof, sufficient to meet the interest or principal of said bonds, or any part thereof due to the plaintiff.

The direction of the statute is:

"There shall be levied, assessed, and collected annually at the time and in the same manner as other taxes are levied, assessed, and collected in said city and county, a tax upon the lands described in section three of this act, sufficient to pay the interest on said bonds as the same matures; said tax to be collected out of the said land only. The assessment therefor, however shall be adjusted and distributed according to the enhanced values of the respective parcels of land, as fixed in the said final report by the said board. * * * There shall be levied, assessed, and collected annual-

ly, at the time, and in the manner, and upon the same lands, and in accordance with the same rule of assessment upon enhanced values as provided in this section, a tax upon each $100 valuation, sufficient to raise one-twentieth of the principal of said bonds."

The duties of making these assessments and levying and collecting these taxes were purely statutory duties, created, not by municipal obligation but primarily by a board of commissioners proceeding under a state statute. It is true the statute directed that the mayor and auditor and the city and county surveyor should constitute the board of Dupont street commissioners; but it also provided that they should each receive a compensation of $2,000 for their services. The services of these officers as a board of commissioners, were, therefore, not municipal services for which they were otherwise compensated, but were special services under the act of the Legislature. It seems to me that the facts of this case bring it within the doctrine declared by the Supreme Court in the case of Peake v. New Orleans, 139 U. S. 342, 11 Sup. Ct. 541, 35 L. Ed. 131, where the city of New Orleans was held to be a compulsory trustee, as distinguished from a voluntary and contractual trustee, as afterward found in Warner v. New Orleans, and New Orleans v. Warner, supra. In the Peake Case, as in the present case, the complainant charged, among other things, that the defendant did not collect certain assessments when it ought to and could have done so. The assessments were to be levied and collected under a statute providing for drainage work. The court said, with respect to this distinction:

"The scheme was one of special assessments, as distinguished from municipal tax for general benefits. The distinction between the two is obvious and well recognized. It is stated by Cooley in his work on Taxation, page 416: 'The general levy of taxes is understood to exact contributions in return for the general benefits of government, and it promises nothing to the persons taxed, beyond what may be anticipated from an adminstration of the laws for individual protection and the general public good. Special assessments, on the other hand, are made upon the assumption that a portion of the community is to be especially and peculiarly benefited, in the enhancement of the value of property peculiarly situated as regards a contemplated expenditure of public funds; and in addition to the general levy, they demand that special contributions, in consideration of special benefit, shall be made by the persons receiving it. The justice of demanding the special contribution is supposed to be evident in the fact that the persons who are to make it, while they are made to bear the cost of public work, are at the same time to suffer no pecuniary loss thereby; their property being increased in value by the expenditure to an amount at least equal to the sum they are required to pay. This is the idea that underlies all these levies."

Then, after referring to the legislation which brought the city of New Orleans into relation with the drainage work and the assessments to carry it on, the court said:

"The obligations cast upon the city were purely statutory, and while they were, in respect to the party doing the work, and the collection of assessments, somewhat in the nature of a trust, they are more to be regarded as statutory obligations, a failure to discharge which puts less strain on the moral sense. * * * If ever there was a case in which the responsibility of a city should be narrowed, this is one. By the legislation of the state, it was denuded of all freedom of action. It had no choice of

contractor or price. Neither the property to be taxed, nor the means or method of collecting the assessments. was intrusted to its discretion. This is not a case in which there was a failure on the part of the legislative body, the city council, to prescribe and provide sufficient machinery for the collection of assessments. No superintendence of the financial department, whether as to the property to be assessed, the amount of the assessment or the collection thereof. was intrusted to the municipality. All this financial power was placed directly, by state action, without its consent, in one of its official boards. Thus denuded of freedom of action it may properly insist upon the narrowest limits of responsibility. If the financial duty was devolved, without its consent, upon one of its administrative boards, and such board was derelict of duty, it may properly say to a complaining party, your remedy was mandamus, to compel prompt and efficient action by that board."

If I am correct in my opinion that the law of the Peake Case is applicable to the present case, it follows that the duty of assessing, levying, and collecting the Dupont street taxes was a statutory duty imposed upon certain officers of the city and county of San Francisco. and was not a voluntary municipal or contractual obligation, and that the defendant was not a voluntary or contractual trustee, and is not liable as such, upon the facts stated in the bill of complaint. It is alleged in the bill of complaint that the defendant alleges and pretends contrary to the truth; that in each fiscal year from 1877–1878, to and including 1896–1897, taxes were levied and assessed on the property described in section 3 of the act of the Legislature, and that the defendant has exhausted its power to make further liens and assessments with respect to such taxes; that the defendant also pretends that it has omitted to collect the taxes so levied and assessed, for the reason that certain actions were commenced in the Superior Court of the city and county of San Francisco in 1879–1880, to enjoin the tax collector from selling the property described in the act; and that in 1881 judgments were entered in all of said actions restraining the tax collector and his successor in office, from advertising and offering for sale any of said lands described in said actions, or any past or future levy or attempted levy on account of the provisions of said act; and that said judgments have not been reversed, vacated or modified, and the said injunctions still remain of record as the final judgments in said actions and bind and are conclusive upon the successors in office of the said tax collector, and all of the property described in said actions is protected by said judgments and injunctions, and none of the same can be sold, and the defendant pretends, and alleges that by reason thereof it is prevented from performing the duties and obligations of such trust, and has performed the obligations of such trust to the extent of its ability, and is therefore not negligent in its duty to the complainant. The complainant alleges that in any actions commenced against the tax collector, neither the complainant nor the defendant was a party thereto, and that it was the duty of the defendant, as trustee of the plaintiff, to become a party to said actions and to notify the plaintiff of the pendency of said actions, and to use all reasonable means and diligence to defend said actions so far as the same affected or attempted to affect the validity of the bonds, and to take all reasonable

steps and proceedings necessary and proper to defend the plaintiff and her interest in said bonds and the interest accruing thereon, and that the defendant failed and neglected to notify plaintiff of the pendency thereof; that defendant omitted and neglected its duties and obligations to complainant in carrying out said trust, to exercise and use such means, process, and steps as were necessary, proper, and convenient to appear in said action to defend the same, and to use all ready and reasonable means within its control to prosecute said action, by appeal or otherwise, to its final termination, and neglected to use such reasonable means as were in its power and control to protect the interests of plaintiff, and to carry out the obligations and duties imposed upon it under the conditions of the trust. '

I am of the opinion that even assuming that the city and county of San Francisco was charged by law with a trust in the duty imposed to assess and collect the taxes to pay the interest and principal of the bonds described in the bill of complaint, nevertheless it appears from the bill of complaint that that trust was repudiated and denied when it defaulted in the payment of the interest on the bonds due and payable on and after July 1, 1881; that it repudiated and denied the trust when it defaulted in the payment of the several coupons from January 1, 1882, to January 1, 1897; that the trust was also repudiated and denied when it defaulted in the payment of the bonds when they came due on the 1st day of January, 1897; that the trust was also repudiated and denied when the city and county of San Francisco failed to become a party to the suits against the tax collector in 1879 and 1880, and failed to intervene prior to the judgments entered in such suits in 1881. The first default occurred more than 20 years, and the last default on the payment of the interest and the principal of the bonds, more than five years, before the commencement of the present suit; and the failure to defend against the suits brought to restrain the collection of the taxes occurred more than 20 years before the commencement of this suit. The failure of complainant to bring suit within a reasonable time after these numerous defaults was, in my judgment, gross laches on the part of complainant, and deprives her of the equitable jurisdiction of this court. The complainant should have proceeded at law within the period prescribed by the statute of limitations to enforce the statutory obligation by judgment and the execution of the judgment by mandamus.

The demurrer is therefore sustained, and the bill dismissed.